In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 00-3981 & 00-4115

CEDRIC JOHNSON,

*Plaintiff-Appellee,*

v.

GEORGE M. DALEY,

*Defendant-Appellant,*

*and*

UNITED STATES OF AMERICA,

*Intervenor-Appellant.*

Appeals from the United States District Court
for the Western District of Wisconsin.
No. 98-C-0518-C—**Barbara B. Crabb**, *Chief Judge.*

ARGUED APRIL 19, 2001—REARGUED EN BANC
APRIL 8, 2003—DECIDED AUGUST 19, 2003

Before FLAUM, *Chief Judge*, and POSNER, COFFEY,
EASTERBROOK, RIPPLE, MANION, KANNE, ROVNER, DIANE
P. WOOD, EVANS, and WILLIAMS, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* Section 803(d) of the
Prison Litigation Reform Act, codified at 42 U.S.C.
§1997e(d), sets both absolute and relative limits on attor-
neys' fee shifting. The district court held these limits
unconstitutional because they disadvantage prisoners
compared with other plaintiffs, whose recoveries under 42

U.S.C. §1988(b) in constitutional-tort litigation are not subject to any statutory maximum. *Johnson v. Daley*, 117 F. Supp. 2d 889 (W.D. Wis. 2000). Every court of appeals that has considered this question has held, to the contrary, that §1997e(d) is within Congress' authority. See *Boivin v. Black*, 225 F.3d 36 (1st Cir. 2000); *Hadix v. Johnson*, 230 F.3d 840 (6th Cir. 2000); *Walker v. Bain*, 257 F.3d 660 (6th Cir. 2001); *Foulk v. Charrier*, 262 F.3d 687 (8th Cir. 2001); *Madrid v. Gomez*, 190 F.3d 990 (9th Cir. 1999); *Jackson v. State Board of Pardons & Paroles*, 331 F.3d 790 (11th Cir. 2003). Accord, *Collins v. Algarin*, 1998 U.S. Dist. Lexis 83 (E.D. Pa. Jan. 9, 1998), affirmed by an equally divided court under the name *Collins v. Montgomery County Board of Prison Inspectors*, 176 F.3d 679, 686 (3d Cir. 1999) (en banc). Like these other circuits, we hold that §1997e(d) is rationally related to valid objectives and hence is within the legislative power, whether or not it is wise.

# I

Section 1997e(d) provides:

> (1) In any action brought by a prisoner who is confined to any jail, prison, or other correctional facility, in which attorney's fees are authorized under [42 U.S.C. §1988], such fees shall not be awarded, except to the extent that—
>
>> (A) the fee was directly and reasonably incurred in proving an actual violation of the plaintiff's rights protected by a statute pursuant to which a fee may be awarded . . . ; and
>>
>> (B)(i) the amount of the fee is proportionately related to the court ordered relief for the violation; or (ii) the fee was directly and reasonably incurred in enforcing the relief ordered for the violation.

(2) Whenever a monetary judgment is awarded in an action described in paragraph (1), a portion of the judgment (not to exceed 25 percent) shall be applied to satisfy the amount of attorney's fees awarded against the defendant. If the award of attorney's fees is not greater than 150 percent of the judgment, the excess shall be paid by the defendant.

(3) No award of attorney's fees in an action described in paragraph (1) shall be based on an hourly rate greater than 150 percent of the hourly rate established under [18 U.S.C. §3006A] for payment of court-appointed counsel.

(4) Nothing in this subsection shall prohibit a prisoner from entering into an agreement to pay an attorney's fee in an amount greater than the amount authorized under this subsection, if the fee is paid by the individual rather than by the defendant pursuant to [§1988].

Subsections (1) and (2) establish relative limits: fees must be "proportionately related to the court ordered relief" and, when monetary relief is awarded, the fees attributable to that relief cannot exceed 150% of the damages. Subsection (3) establishes an absolute limit at 150% of the hourly rate for defense counsel under the Criminal Justice Act, times the number of hours reasonably devoted to the litigation. Because the CJA rate (set by the Judicial Conference of the United States) currently is $90 per hour, the maximum that the defendant may be directed to underwrite is $135 per hour.[†] The total amount that an attorney may *receive*,

---

[†] Section 3006a, the Criminal Justice Act, authorizes payment at $60 per hour for work in court and $40 per hour for other work. It permits the Judicial Conference to raise the cap to the greater

(continued...)

however, is greater, not only because the attorney is entitled to 25% of the judgment under subsection (2) but also because the client is free under subsection (4) to agree by contract to pay more—out of the recovery or out of other assets.

This case shows how the statute works. Cedric Johnson sued George Daley, the medical director of the Bureau of Correctional Health Services for the Wisconsin Department of Corrections, under 42 U.S.C. §1983, contending that Daley subjected him to cruel and unusual punishment by waiting three years before certifying that Johnson, whose alcoholism had damaged his liver, was eligible for a transplant at public expense. Johnson contended that Daley had been deliberately indifferent to his serious

---

† (...continued)
of $75 per hour or an amount calculated with respect to cost-of-living increases awarded to federal employees. In September 2000 the Judicial Conference authorized use of the $75 rate for all work nationwide and determined that the inflation-adjusted rate would be $113 per hour, but that appropriated funds did not permit compensation at more than $75. The 2002 and 2003 appropriations acts for the judiciary provide funds sufficient to pay appointed counsel $90 per hour, and it is the policy of the Judicial Conference that all work performed after May 1, 2002, should be compensated at that level. Johnson's case came to trial in the district court before this increase, so the CJA maximum at the time was $75, and the PLRA maximum therefore was $112.50 per hour. It is possible that some of the legal work performed on Johnson's behalf is affected by the earlier $60 and $40 maximums, which remained in effect in scattered districts. To facilitate exposition, we use throughout the opinion the $90 CJA funded rate, which implies a maximum of $135 per hour under the PLRA. By employing this figure, we do not imply any view on the question whether it is the right one, or whether instead $169.50 (150% of $113) is today's cap. Compare *Webb v. Ada County*, 285 F.3d 829, 838-39 (9th Cir. 2002), with *Hernandez v. Kalinowski*, 146 F.3d 196, 201 (3d Cir. 1998).

medical need. See *Farmer v. Brennan*, 511 U.S. 825 (1994); *Estelle v. Gamble*, 429 U.S. 97 (1976). Johnson was put on the eligibility list in June 1999 and appears to have suffered no long-term injury from the delay. Nonetheless, a jury agreed with Johnson that he should have been made eligible sooner and awarded him $10,000 in compensatory damages, plus $30,000 in punitive damages. Attorneys from Foley & Lardner and Heller Ehrman White & McAuliffe represented Johnson at the district judge's request; Johnson did not enter into an agreement with counsel under §1997e(d)(4), so compensation depends entirely on the application of subsections (1) through (3). Counsel asked the judge to direct Daley to pay $92,997.20 in attorneys' fees. This request exceeds both relative and absolute maximums: the relative cap under subsection (2) is $60,000 in fees (150% of the judgment), and application of the absolute cap in subsection (3) produces a lower award of $36,451.50. (This figure comes from Johnson's lawyers. Daley and the United States have not questioned its accuracy, nor have we plumbed the details of its calculation.) Counsel sought compensation for 525.1 hours of work—much of it by paralegals with rates under $135 per hour, but some time by partners who contended that their market rate is as high as $325 per hour. Daley did not deny that this legal time had been reasonably devoted to the case, though he did dispute the hourly rates.

Under §1997e(d) counsel could receive a maximum of $46,451.50 for legal services—$10,000 from the award plus $36,451.50 extra from Daley. As we read subsection (2), attorneys' compensation comes *first* from the damages, as in ordinary tort litigation, and only if 25% of the award is inadequate to compensate counsel fully may defendant be ordered to pay more under §1988. Cf. *Gisbrecht v. Barnhart*, 535 U.S. 789 (2002) (using this approach in Social Security cases, where any excess would be provided by the Equal Access to Justice Act, 28 U.S.C. §2412(d),

rather than §1988). The district court proceeded in a different way, first calculating counsel's entitlement and then determining how much of this should be satisfied from the damages. After notifying the United States, which intervened to defend the constitutionality of the statute, the district court declined to enforce subsections (2) and (3). Subsection (1)(B)(i), which provides that fees must be "proportionately related" to the violation, is in the district court's view an appropriate cap—because the judge gets to determine how high a "proportion" to use. The court concluded that attorneys' fees should be set at $80,000, or 200% of the judgment, under §1988, writing that this level is not disproportionate to the damages. Next the judge held that Johnson should contribute only $200 of this out of the judgment, leaving him with $39,800 while Daley has been ordered to pay a total of $128,578.81: $10,000 in compensatory damages, $30,000 in punitive damages, $79,800 in attorneys' fees, and $8,778.81 in costs. The record does not disclose how much, if any, of this tab will be picked up by the State of Wisconsin as Daley's employer. Both Daley and the United States have appealed; the appeal is limited to the amount by which the attorneys' fees exceed the maximum allowed by §1997e(d)(2) and (3). Counsel have not cross-appealed to seek a greater portion of the damages awarded to Johnson.

## II

### A

The district court held that §1997e(d)(2) and (3) are incompatible with the due process clause of the fifth amendment, which since *Bolling v. Sharpe*, 347 U.S. 497 (1954), has been deemed to include an equal-protection principle. See, e.g., *Vance v. Bradley*, 440 U.S. 93 (1979). Yet the Prison Litigation Reform Act (PLRA from now on) does not rest on any of the powers granted by Article I of

the Constitution; its genesis is §5 of the fourteenth amendment, which says that "Congress shall have power to enforce, by appropriate legislation, the provisions of this article." Legislation under the power granted by §5 is not necessarily subject to limitations on the original grants of national power; this is why *Fitzpatrick v. Bitzer*, 427 U.S. 445 (1976), holds that Congress may use its §5 power to subject states to suit in federal court, despite the contrary text of the eleventh amendment. So the question to ask is whether §1997e(d) "enforces" the fourteenth amendment, which points us to the equal protection clause in §1 of that amendment without any need to detour through the fifth amendment—for a law at odds with the fourteenth amendment's substantive provisions cannot be one to "enforce" them. See, e.g., *City of Boerne v. Flores*, 521 U.S. 507 (1997); *University of Alabama v. Garrett*, 531 U.S. 356 (2001).

Legislation that does not burden a suspect class or affect fundamental rights satisfies the equal-protection requirement if the legislature could think the rule rationally related to any legitimate goal of government. Prisoners are not a suspect class; conviction of crime justifies the imposition of many burdens. See, e.g., *Connecticut Dep't of Public Safety v. Doe*, 538 U.S. 1 (2003) (public identification as a felon); *Hudson v. United States*, 522 U.S. 93 (1997) (occupational debarment). Nor is there a fundamental right to have one's adversary, or the public treasury, defray all or part of the cost of litigation. That is why we held the three-strikes provision in the PLRA, 28 U.S.C. §1915(g), compatible with the Constitution. See *Lewis v. Sullivan*, 279 F.3d 526 (7th Cir. 2002). Although prisoners enjoy a fundamental right of access to the courts, see *Lewis v. Casey*, 518 U.S. 343 (1996), there is no right of *subsidized* access. See *United States v. Kras*, 409 U.S. 434 (1973). The right to publish a newspaper does not imply a right to governmental funding, nor does a right to read books imply entitlement to a public library that circulates books

without charge. A woman's right to choose whether to have an abortion does not imply a right to have the government cover the medical costs. See *Maher v. Roe*, 432 U.S. 464 (1977). A right to education does not imply a right to free transportation to school. See *Kadrmas v. Dickinson Public Schools*, 487 U.S. 450 (1988). A right to petition for redress of grievances does not imply a right to free writing paper and stamps. And a right to seek redress in court does not imply entitlement to have someone else pay for your lawyer. The Supreme Court made this pellucid, for prisoners in particular, when holding in *Murray v. Giarratano*, 492 U.S. 1 (1989), that a right to wage a collateral attack on one's conviction does not entail a right to counsel at public expense, even in a capital case.

Legislation singling out prisoners accordingly is analyzed under the rational-basis standard—as the plaintiffs concede, and as the Supreme Court held in *McDonald v. Board of Election Commissioners*, 394 U.S. 802 (1969). See also *Zehner v. Trigg*, 133 F.3d 459 (7th Cir. 1997) (applying the rational-basis standard to 42 U.S.C. §1997e(e), a part of the PLRA that requires prisoners to show physical injury as a condition to recovery, and holding that the statute is valid under that standard). Cf. *Marshall v. United States*, 414 U.S. 417 (1974). Chief Justice Warren explained in *McDonald* how the rational-basis standard works:

> The distinctions drawn by a challenged statute must bear some rational relationship to a legitimate state end and will be set aside as violative of the Equal Protection Clause only if based on reasons totally unrelated to the pursuit of that goal. Legislatures are presumed to have acted constitutionally even if source materials normally resorted to for ascertaining their grounds for action are

> otherwise silent, and their statutory classifications will be set aside only if no grounds can be conceived to justify them. See *McGowan v. Maryland*, 366 U.S. 420 (1961); *Kotch v. Board of River Port Pilot Commissioners*, 330 U.S. 552 (1947); *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61 (1911). With this much discretion, a legislature traditionally has been allowed to take reform "one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind," *Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 489 (1955); and a legislature need not run the risk of losing an entire remedial scheme simply because it failed, through inadvertence or otherwise, to cover every evil that might conceivably have been attacked. See *Ozan Lumber Co. v. Union County National Bank*, 207 U.S. 251 (1907).

394 U.S. at 809. Under this standard, a legislative decision "is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 315 (1993). See also, e.g., *Nordlinger v. Hahn*, 505 U.S. 1, 15 (1992); *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 463-65 (1981); *Vance v. Bradley*, 440 U.S. at 111. "[R]ational-basis review in equal protection analysis 'is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.'" *Heller v. Doe*, 509 U.S. 312, 319 (1993) (citations omitted). See also, e.g., *New Orleans v. Dukes*, 427 U.S. 297 (1976); *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307 (1976); *University of Alabama v. Garrett*, 531 U.S. at 366-67 (holding that *Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1985), on which the district court relied in this case, does not establish a sliding-scale approach).

**B**

Whether the line drawn in the PLRA between prisoners' suits and free persons' suits is rational may depend on answering the question: "equal *with respect to what*"? The district court compared §1997e(d) with §1988, which entitles prevailing parties in constitutional cases to recover reasonable attorneys' fees. Section 1988 has been treated as asymmetric—that is, prevailing plaintiffs recover their legal expenses but prevailing defendants do not. See *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412 (1978) (defendants recover legal expenses only if the suit is frivolous—in which event they would be entitled to re-compense even without regard to a statute). A plaintiff achieves "prevailing party" status by recovering *any* judgment, even for nominal damages. Compare *Farrar v. Hobby*, 506 U.S. 103 (1992), with *Buckhannon Board & Care Home, Inc. v. West Virginia Dep't of Health & Human Resources*, 532 U.S. 598 (2001). Although fees must be "reasonable", so that *de minimis* or Pyrrhic victories do not support fee-shifting, see *Maul v. Constan*, 23 F.3d 143, 145, 147 (7th Cir. 1994), the flexible reasonableness standard permits a court to award legal fees that substantially exceed the damages, see *Riverside v. Rivera*, 477 U.S. 561 (1986), even though no solvent private litigant in tort or contract litigation would agree to pay counsel more than the anticipated recovery (or the value of equitable relief). So §1988 is exceptionally pro-plaintiff. The district judge asked why, if medicine this strong is needed to promote consti-tutional claims by free persons against state actors, prison-ers do not need at least as much assistance.

This approach assumes, however, that prisoners and free persons have similar constitutional claims. As Johnson's case shows, that is not altogether true. Free persons are not constitutionally entitled to liver transplants or other costly medical care at public expense. States have ex-tra obligations toward prisoners and must provide care

appropriate to their serious medical needs because imprisonment takes away their ability to fend for themselves. See *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989). A complaint along the lines of Johnson's, if made by a free person, usually would take the form of a contention that a physician committed the tort of malpractice. And the prevailing party in tort litigation must bear 100% of his own attorneys' fees; that's the American Rule. See *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240 (1975). Now it is true that a free person may recover for negligence, while a prisoner must show intentional misconduct (where "deliberate indifference" to his needs counts as intentional); the free person therefore is more likely to prevail in any given situation. But the free person still must cover his own legal costs, even if he shows gross negligence or wilful misconduct by the physician. Such proof may lead to awards of punitive damages (as in Johnson's case) but will not require the defendant to reimburse the plaintiff for the cost of legal representation. If we compare prisoners under §1997e(d) with free persons who received bad medical care, perhaps the question should be why prisoners receive legal services at defendants' expense, and free persons do not.

Ordinary tort litigation is not the only option. Suppose Johnson had been free and unable to pay for a liver transplant. He might have requested medical care under Medicaid—but if the responsible agency had delayed making him eligible, there would not have been any option to litigate. The agency's decision about applications for individual benefits is the end of the line under the Medicaid program. See *Heckler v. Ringer*, 466 U.S. 602 (1984). Such a free person is decidedly worse off than a prisoner. Or consider how Johnson would have been treated as a veteran seeking medical care in a Veterans Administration hospital. A decision by the hospital's staff

deferring his eligibility for a liver transplant would have been subject to review by an administrative tribunal but not the Article III courts. Compare 38 U.S.C. §7252 with 38 U.S.C. §7292(d)(2). And, until recently, veterans were prohibited from paying attorneys more than $10 out of their *own* resources to seek a favorable result in the administrative process. The Supreme Court held in *Walters v. National Ass'n of Radiation Survivors*, 473 U.S. 305 (1985), that this cap was constitutional because Congress was entitled to rely on the bar (and veterans' organizations) to donate free legal services. Once again prisoners are decidedly better off under the PLRA.

If a veteran suffers on account of substandard medical care at a VA hospital, the legal remedy is under the Federal Tort Claims Act. This statute forbids punitive damages. 28 U.S.C. §2674 ¶1. It caps attorneys' fees at 25% of any judgment (20% if the case is settled). 28 U.S.C. §2678. Those legal fees are deducted from the plaintiff's recovery; the United States does not cover any part of a prevailing plaintiff's legal expenses. A prisoner can offer his lawyer at defendant's expense as much as 150% of the recovery (plus a quarter of the recovery itself, and any additional amount provided by contract), while a veteran can offer counsel no more than 25% of a recovery that never includes punitive damages. Moreover, the plaintiff is forbidden to supplement these fees by private contract with his lawyer. The Westfall Act, 28 U.S.C. §2679(d), makes this remedy against the United States exclusive; any effort to evade the cap by suing federal employees will be defeated by replacing them with the United States as the sole defendant. See generally *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417 (1995). A litigant who can show that the United States took in the litigation itself a position that was not substantially justified may recover some attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. §2412(d), but even the most egregious pre-litigation con-

duct by federal agents or employees does not permit an award of attorneys' fees. Litigants who qualify for an award under the EAJA encounter a statutory cap: "attorney fees shall not be awarded in excess of $125 per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee" (§2412(d)(2)(A)(ii)). By contrast, the PLRA permits the court to award fees up to $135 per hour, to be paid by the defendant, without any need to prove that the defendant's conduct in the litigation was not "substantially justified."

Counsel readily agree to represent veterans and other injured persons in suits under the FTCA, even though these suits are subject to caps more stringent than those confronting prisoners under the PLRA. Congress rationally could conclude in light of this experience that prisoners, like veterans, will be able to enjoy the benefit of counsel, when they have good claims (a vital qualifier).

It is difficult to ascribe the caps in the PLRA to irrational antipathy, when prisoners fare better under the PLRA than do veterans and other free persons who must bear their own legal expenses under the American Rule and the FTCA. Caps on attorneys' fees, far from being unique to prisoners (as the district judge supposed), are common in litigation against governments and their employees. For example, persons claiming benefits under the Social Security program must pay their own lawyers (unless the EAJA applies because the government's litigating position was unreasonable); and it is unlawful for any claimant to agree to pay counsel more than 25% of past-due benefits as compensation for legal services rendered in obtaining those benefits. 42 U.S.C. §406(b) (discussed in *Gisbrecht, supra*). School children and their parents, seeking a better education under the Individuals with Disabilities Education Act, may not recover more than

$1,300 in attorneys' fees (at rates of more than $50 per hour) in suits within the District of Columbia. D.C. Code. §11-2604. That limit (which has since been raised) was sustained as rational, even though Congress allows greater awards outside the District. See *Calloway v. District of Columbia*, 216 F.3d 1, 4-5 (D.C. Cir. 2000). In a world where veterans, employees who have paid employment taxes for a half century, and school children must pay for their own lawyers, or accept reimbursement at low rates, it is difficult to treat as *irrational* a statute limiting to $135 per hour, or 150% of the recovery, the amount of legal fees that courts may require defendants to pay in prisoners' cases.

Prisoners may think of $135 per hour as munificent, compared with the compensation of their lawyers in pre-trial and trial proceedings. Solvent defendants must pay all of their legal expenses and are not reimbursed if they prevail. For insolvent defendants, the Criminal Justice Act, 18 U.S.C. §3006A, in conjunction with decisions of the Judicial Conference, caps at $90 per hour how much the public fisc will pay for counsel—yet criminal defendants have a right to counsel far stronger than any entitlement to fee-shifting in civil suits. See *Gideon v. Wainwright*, 372 U.S. 335 (1963). The hourly cap under the CJA combines with a per-case cap of $5,200 in a felony prosecution. Although courts are authorized to approve compensation exceeding $5,200 in exceptional cases, few criminal trials are so exceptional that defense counsel take home $36,000, the PLRA cap for Johnson. If this had been a criminal prosecution, and Johnson had been a defendant rather than the plaintiff, his lawyers would have been paid considerably less than $36,000. If $5,200 is enough to secure a competent criminal defense—and it is—how can the PLRA cap of $36,000 be unconstitutionally *low* for a civil plaintiff? The stakes of the criminal prosecution for the defendant are considerably greater than the stakes in most post-imprisonment civil suits.

The kind of post-imprisonment litigation most important to inmates is the collateral attack—on the conviction itself or on decisions affecting good-time credits (and thus the computation of the release date). Yet, when seeking release, a prisoner is entitled to no legal assistance at all. If the prisoner obtains legal assistance and prevails, with the court declaring that the incarceration was unconstitutional from the outset, the state government will not be required to pay a single penny of counsel's fees. Courts and defendants alike rely on—and receive—legal services donated by the bar or supplied by legal assistance bureaus (defender programs, legal aid clinics at law schools, programs underwritten by the Legal Services Corporation, or programs funded by IOLTA proceeds, see *Brown v. Legal Foundation of Washington*, 123 S. Ct. 1406 (2003)). Only in capital cases does any federal statute provide for post-conviction counsel, and even then the rate is capped at $125 per hour, see 21 U.S.C. §848(q)(10)(A), or $10 less than the current maximum under the PLRA.

If asked why $0 for most collateral attacks and prosecutions of solvent persons, $90 for criminal defense under the CJA if the defendant is insolvent, $125 under the EAJA and collateral attacks in capital cases, $135 under the PLRA, and 25% of back benefits under the Social Security system, we might be unable to give a convincing answer. Caps have an arbitrary quality; different majorities in the legislature at different times have different willingness to expend public funds (or write checks that must be paid by state actors such as Dr. Daley, or the states themselves as indemnitors). Some of these caps depend on an interaction between legislation and decisions of the Judicial Conference, and these different bodies may have different objectives. Some Congresses favor more litigation and adjust fee schedules to promote it; other Congresses pay more attention to the costs of adding cases to the docket (including the costs to defendants and to the federal system

when Congress is adopting rules for state actors) and
adjust rules to make litigation less attractive. There is no
one right answer to the question how much litigation
there should be, and who should pay for that litigation.

We are conscious that the numbers we have given are
not directly comparable. Criminal defense counsel re-
ceives $90 per hour win or lose; a prisoner's lawyer re-
ceives as much as $135 per hour, or a Social Security
claimant's lawyer 25% of the back benefits, only in the
event of victory, as with a tort lawyer on contingent fee;
an award at $125 per hour under the EAJA depends on
*both* prevailing in the litigation *and* showing that the
government's position was not substantially justified. So
the actuarial value of an hour devoted to the case by
criminal defense counsel may exceed the value of an hour
under the PLRA. But the value of an hour under the
PLRA exceeds that of an hour under the EAJA—and *any*
fee-shifting system offers more to counsel than does the
no-shifting approach on post-conviction challenges to the
fact of incarceration.

The United States Code and its implementing rules
are the work of thousands of different actors over scores
of years; consistency is not possible. But what this means
is that *all* of these different systems could be thought
rational solutions to the question "how much may plaintiffs
be allowed to spend for legal services, how much of that
must be paid for by the losing side, and how much of the
cost of litigation will be covered by the public fisc?" Litiga-
tion produces benefits (and sometimes costs) for third
parties; it is to this extent a public good, and determining
how much of a public good to supply (and at whose cost)
is an intractable problem. The American Rule is a rational
approach; the British loser-pays rule is a rational approach;
asymmetric fee-shifting in §1988 is a rational approach;
asymmetric fee shifting plus compensation for the risk of
loss in order to induce counsel to be indifferent between

paying clients and chancy constitutional claims would be rational (and is used in common-fund cases, though not under statutes such as §1988, see *Burlington v. Dague*, 505 U.S. 557 (1992)); and fee caps such as the FTCA, the EAJA, and the PLRA also represent rational approaches. The observation that prisoners receive less under the PLRA than under §1988 no more shows that the PLRA is irrational, than the fact that defendants pay *more* under §1988 than under the PLRA (or the FTCA, or the EAJA, or the American Rule) shows that §1988 is itself irrational. These are simply different legislative solutions to an enduring problem; in a democracy, each of these options is open to the people's representatives.

## C

Even if §1988 is the right benchmark for the question "compared to what?", the rational-basis standard permits Congress to distinguish prisoners from free persons when deciding how much the defendant must subsidize a prevailing plaintiff. The PLRA draws many distinctions between prisoners and other persons covered by civil rights statutes. We held in *Zehner* that Congress rationally could distinguish prisoners from free persons for the purpose of suits seeking compensation for mental distress. We held in *Lewis* that Congress rationally applied the three-strikes rule to prisoners but not free persons. See also *Lucien v. DeTella*, 141 F.3d 773 (7th Cir. 1998) (PLRA's fee-collection and prepayment system is constitutional). The Supreme Court has twice interpreted and enforced the PLRA's rule, 42 U.S.C. §1997e(a), that prisoners (and only prisoners) must exhaust administrative remedies before filing suit under 42 U.S.C. §1983. *Porter v. Nussle*, 534 U.S. 516 (2002); *Booth v. Churner*, 532 U.S. 731 (2001). Neither decision hints that there is anything problematic about treating prisoners differently. After we

held unconstitutional the portion of the PLRA making equitable relief harder to get (and harder to keep) in prison-reform suits than in litigation about other institutions, see *French v. Duckworth*, 178 F.3d 437 (7th Cir. 1999), the Supreme Court reversed and held that the PLRA must be applied as written. *Miller v. French*, 530 U.S. 327 (2000). None of the Justices suggested that there is any constitutional problem in distinguishing prisoners' suits from free persons' suits. And in *Martin v. Hadix*, 527 U.S. 343 (1999), the Supreme Court considered one issue about the scope of §1997e(d) itself, again without any of its members suggesting that the statute has a constitutional flaw.

Congress could conclude that prisoners differ from free persons in ways relevant to litigation. A rational legislature would be entitled to believe the following:

- Prisoners have time on their hands. Unlike free persons, who must skip work or shun family to visit a law library and draft legal documents, prisoners have ample leisure. Persons with low opportunity cost of time substitute their own efforts for purchased commodities, such as legal services, and demand more of those things (such as litigation) that can be had for the investment of time alone. As a result, prisoners file many more federal suits per person than do free persons. (Prisoners, who account for less than 1% of the population, file more than 20% of all civil actions in the federal courts. See Administrative Office of the U.S. Courts, *Judicial Business of the United States Courts 2002* Table C-2. In the year preceding the PLRA's enactment, prisoners filed federal suits about 35 times as frequently as noninmates. See Margo Schlanger, *Inmate Litigation*, 116 Harv. L. Rev. 1555, 1575 (2003).)

- Prisoners receive paper and postage; they have access to legal materials, see *Bounds v. Smith*,

430 U.S. 817 (1977); inmate writ-writers provide assistance that, for free persons, would be deemed the unauthorized practice of law. These materials and services make it easier for prisoners to litigate.

• Many prisoners have a burning desire to turn the tables on the guards and other prison personnel, discomfiting if not hurting or humiliating them. This non-economic incentive to litigate produces additional suits, which as grudge matches are particularly hard to resolve.

• For some prisoners, litigation is recreation. Although most free persons shun litigation, because they have many better ways to amuse themselves, prisoners may see a trip to court as a vacation.

• These and other circumstances, including defendants' desire not to attract additional nuisance suits, make prisoners' suits unusually hard to settle, so that they impose on the judicial system (and thus on other litigants) a burden disproportionate to their numbers and intrinsic difficulty. (Professor Schlanger found that 6% of prisoners' civil suits are settled, compared with 28% of noninmates' civil-rights litigation and 50% of ordinary tort litigation. 116 Harv. L. Rev. at 1598. She also determined that the costs federal courts and prisons incur in handling prisoners' suits top $175 million annually, far exceeding prisoners' damages recoveries. *Id*. at 1622-26.)

• Prisoners are less honest than free persons and thus more likely to tell tall tales of victimization. The convictions that put them in prison establish their proclivity to violate the law when they see a personal advantage in doing so. (This is a prem-

ise of Fed. R. Evid. 609, which permits use of prior convictions to impeach the veracity of testimony.) The pot o' gold at the end of litigation is a lure that induces dishonest claims.

· At the same time, however, prisoners are less amenable to sanctions for making false claims. Many are destitute; none earns wages subject to garnishment. The threat of prosecution for perjury holds little terror for a person already in prison, as a perjury sentence would be deferred until the expiration of existing terms; for those serving life sentences without prospect of parole, no further penal sanction is possible.

It is not our part to determine which of these things is true; it is enough to say that a legislature could think them true without taking leave of its senses. They make it apt to ask why, if prisoners file so many suits even though they receive legal assistance only 4% of the time, they require (or deserve) a subsidy to provide more legal assistance at defendants' expense. The 4% figure for prisoners who have counsel comes from the Bureau of Justice Statistics and is reported in Roger A. Hanson & Henry W.K. Daley, *Challenging the Conditions of Prisons and Jails: A Report on Section 1983 Litigation* 21-22 (1995). Some prisoners have counsel from the outset; others, including Johnson, benefit from the district court's assistance in recruiting counsel. Even after the PLRA's adoption, about 4.4% of prisoners' suits are prosecuted with the benefit of counsel. See Schlanger, 116 Harv. L. Rev. at 1609. Many of these lawyers—who are not appointed or otherwise conscripted but serve voluntarily, see *Mallard v. United States District Court*, 490 U.S. 296 (1989)—are willing to assist for slight compensation, but a legislature rationally may think that the supply of lawyers prepared to serve on judicial request is affected by the compensation available if the plaintiff prevails. See Stewart J.

Schwab & Theodore Eisenberg, *Explaining Constitutional Tort Litigation: The Influence of the Attorney Fees Statute and the Government as Defendant*, 73 Cornell L. Rev. 719 (1988).

As the district judge perceived matters, the respects in which prisoners differ from free persons affect only frivolous and small stakes litigation. Prisoners file a superabundance of frivolous suits, the judge allowed, but none of these ends in an award of attorneys' fees under §1988 and so none is affected by §1997e(d). Prisoners also file a profusion of small-stakes claims over $10 losses, such as the hobby kit in *Parratt v. Taylor*, 451 U.S. 527 (1981), that any free person would let slide by rather than pay the $150 filing fee and devote costly time to litigation. Professor Schlanger found that prisoners lose some 93% of all civil suits they file. About 6% are settled: these are the only numerically significant victories, as defendants win $^9/_{10}$ of the 3% of cases that make it to trial. 116 Harv. L. Rev. at 1598. The median recovery when a prisoner prevails at trial is $1,000. *Id.* at 1602-03. But the district judge was sure that pestiferous suits could be deterred by limiting attorneys' fees to what is "reasonable" in light of the ends in view (including deterrence of similar petty misconduct by guards), without any need to curtail awards of legal fees in more substantial litigation.

Let us start with the second of these propositions—that the reasonableness requirement in §1988, coupled with decisions such as *Farrar v. Hobby, supra*, and, e.g., *Cole v. Wodziak*, 169 F.3d 486 (7th Cir. 1999), and provisions in the PLRA making it harder for prisoners to litigate without paying the filing fee, suffice to discourage suits over trivial harms (or at least to make prisoners no more likely to file such suits than are free persons). This assumes that Congress is entitled to use only one tool to achieve a given objective. Why would that be? Legislatures often, and legitimately, select multiple devices. A "reasonable-

ness" requirement varies, like the length of the chancellor's foot, from judge to judge. Some are more generous than others with defendants' money, and the district judge's substantial discretion, see *Hensley v. Eckerhart*, 461 U.S. 424, 437-38 (1983), which implies deferential appellate review of fee awards, ensures inconsistency. Congress rationally could conclude—on the ground of equitable treatment alone—that a quantitative rule (such as "fees can't exceed 150% of the judgment") should supplement a qualitative one (such as "fees can't exceed what is reasonable").

As for the contention that §1997e(d) does not affect frivolous suits (because none is eligible for fees under §1988): a legislature rationally may conclude that, because prisoners litigate even frivolous claims to excess, they do not need any extra incentive to litigate meritorious claims.

The district court's view that the PLRA does not affect prisoners' decisions depends on two assumptions, neither of which it justified. The first (which the dissenting opinion likewise indulges) is that each suit is known from the outset to be either frivolous or meritorious. The second is that no prisoner makes rational calculations of gains and losses from suit. Yet Congress is not bound to use these assumptions.

Take the first: that a suit's merit (or lack thereof) is known to court and counsel. Why is this necessarily true? Some suits entail legal uncertainty, others factual uncertainty—and a legislature could conclude that prisoners' proclivity for deceit makes it hard for outsiders to tell which end is up. District judges have a hard time telling the two apart: prisoners lose half of all cases in which the judge deems the claim sufficiently meritorious to recruit counsel, and others are settled for sums that may reflect the defendants' litigation costs rather than a high probability that the prisoner would prevail. See Schwab &

Eisenberg, *supra*, 73 Cornell L. Rev. at 773-74. If district judges cannot reliably separate strong from weak claims, neither can counsel; and if the suit's strength is hard to determine at the outset, then a law reducing fees in successful suits also affects the filing of weak claims. An example makes the point.

Suppose a prisoner's complaint alleges that a guard set upon and beat him without provocation, and the prisoner files an affidavit to that effect. The guard responds that the supposed battery never occurred and adds that the prisoner's injury was inflicted by his cellmate in a gambling dispute. Is this suit frivolous or meritorious? If the prisoner is lying, it is frivolous; if the guard is lying, the suit is meritorious. The judge cannot be sure who is telling the truth and is not authorized to resolve the case short of trial. Nor could a lawyer representing the prisoner be sure who is honest; deceitful prisoners have no reason to be candid with counsel and may be able to recruit fellow inmates as witnesses (for other prisoners may want to make life miserable for the guard, and like the plaintiff are hard to sanction for perjury).

Suppose that 9 out of 10 prisoners making such claims are lying, while 1 of 10 guards is lying. (This assumption tracks Professor Schlanger's finding that prisoners lose 90% of suits that go to trial.) Suppose further that, if the jury finds for the plaintiff, it will award $50,000 in damages and, but for the PLRA, the judge would award $150,000 in legal fees (if a lawyer takes the case). Finally, suppose that with the assistance of counsel the plaintiff would prevail before a jury 20% of the time, while unaided the plaintiff will win only 10% of these cases. Before the PLRA's enactment, this case on filing is worth $10,000 (= $50,000 × 0.2) to the prisoner, who will win 20% of the time with legal assistance (a form of regression to the mean, since most errors will come from the 90% of claims in which the prisoner is deceitful); the expected legal

award is worth $30,000 to counsel ($150,000 × 0.2), which induces counsel to assist; and the expected judgment from the guard's perspective is $40,000 (($50,000 + $150,000) × 0.2). With the PLRA in force, the expected legal fee falls to $15,000 (assuming that the 150% cap is the effective limit), and counsel may be unwilling to take the case. Then the prisoner's expected recovery falls to $5,000 ($50,000 × 0.1), and the guard's anticipated judgment is the same (for there will be no legal fees). If it turns out that $15,000 is enough to recruit counsel, then the prisoner's expected recovery rises to $10,000 (just as before the PLRA), but the guard's outlay falls to $20,000—which, considering the 90% chance that the prisoner is lying, still is too high but is more appropriate than the pre-PLRA anticipated loss of $40,000.

By reducing the prisoner's expected recovery from $10,000 to $5,000 in this *class* of cases, the statute discourages suits that are frivolous when viewed objectively—or so Congress rationally could conclude. The decision is made *ex ante*, and at this stage the PLRA has a direct effect on counsel's willingness to represent those prisoners making frivolous claims. See *Boivin*, 225 F.3d at 45. By reducing the defendant's anticipated cost of litigation from $40,000 to $20,000 for this set of claims even when counsel takes the prisoner's case, the PLRA brings the outcome closer to the real loss entailed—or so, again, Congress rationally could conclude.

We come to the district court's second assumption: that prisoners just don't think this way. The judge was certain that prisoners who are deluded, or determined to lie in court, will do so no matter what, and that prisoners determined to file frivolous suits are incorrigible. The PLRA then will fail; prisoners won't desist from filing in the class of suits we have described (or any other). Yet a legislature could believe that, even if the law has *no*

effect on plaintiffs, its effect from defendants' perspective (reducing the fees that must be paid on top of damages) is a public benefit. Moreover, a legislature rationally could conclude that some prisoners will respond to the adjustments. Marginal effects may differ from average effects. Even if 80% of prisoners are insensible to changes in the litigation process, different behavior by the other 20% would be welcome. A reduction in prisoners' suits by 20% would reduce the total caseload of the federal courts by about 5%. The actual reduction between 1995, the year before the PLRA's enactment, and 2001 is even greater. In 1995 prisoners filed 39,008 federal civil-rights suits, or 24.6 suits per 1,000 inmates. In 2001 they filed 22,206 such suits, at a rate of 11.4 per 1,000 inmates. See Schlanger, 116 Harv. L. Rev. at 1583. While the number of prisoners rose, the number of suits dropped dramatically. (Note that this is a decline *before* application of two other changes made by the PLRA: screening under 28 U.S.C. §1915A and dismissals under §1997e(a) for failure to exhaust administrative remedies.)

That the PLRA has led prisoners to cut by half their propensity to sue shows that they *do* respond to incentives. Litigation is never free, even to a prisoner, if only because it diverts time from exercise and watching television. Congress rationally could believe that the size of the expected recovery influences some prisoners' decisions about how to allocate their time. Although the amount of the effect attributable to §1997e(d) is hard to calculate, its *direction* is knowable. A rational legislature could conclude that a small reduction in weak, trivial, or bogus suits is worth achieving even at some potential cost to prisoners' ability to prevail in the less common meritorious suit. See, e.g., *National Paint & Coatings Ass'n v. Chicago*, 45 F.3d 1124 (7th Cir. 1995) (discussing how the difference between marginal and inframarginal behavior affects analysis under the rational-basis standard).

**D**

Even if all of this is wrong, Congress rationally could suspect that fee awards under §1988 are excessive as a rule, and that prisoners' suits are an appropriate place to explore the results of a cutback. The ability to take one step at a time, to alter the rules for one subset (to see what happens) without changing the rules for everyone, is one of the most important legislative powers protected by the rational-basis standard. And it would be entirely rational to conclude that fees under §1988 are in need of recalibration. Although a plurality of the Court in *Riverside* rejected the contention that attorneys' fees must be proportional to damages, see 477 U.S. at 573-81 (opinion of Brennan, J., joined by Marshall, Blackmun & Stevens, JJ.), four other Justices concluded that §1988 *as it stands* should be understood to limit awards against defendants to the amount that a solvent plaintiff would be willing to pay his own lawyer, a sum generally less than the prospective recovery. See 477 U.S. at 588-96 (Rehnquist, J., dissenting, joined by Burger, C.J., and White & O'Connor, JJ.). Justice Powell, who wrote the dispositive opinion, concluded that the award—about $245,000 in fees for legal work that led to $33,350 in damages—was unjust to the defendants (why should these defendants be made to pay for legal services whose principal effect is to improve deterrence with respect to *other* would-be violators?) but could not be set aside given deferential appellate review and statements in the legislative history implying that some Members of Congress thought a hard cap unwarranted.

Members of Congress who agreed with Justice Powell about fairness to defendants (or for that matter with Justice Rehnquist about the appropriate rule for all civil-rights cases) rationally could decide to alter the approach of §1988 (as Justice Brennan interpreted it) for a subset of all cases to which it applies. For reasons we have cov-

ered, prisoners are a sensible subset with which to begin, and §1997e(d) is a modest step. The district court's award requires Daley to pay more than 12 times the jury's estimate of actual damages; even with the PLRA cap in full effect, Daley must pay about 8 times actual damages, which is still a hefty multiplier. (A larger multiplier than the double-damages approach that, according to *State Farm Mutual Automobile Insurance Co. v. Campbell*, 123 S. Ct. 1513, 1526 (2003), may be the constitutional limit for awards based on emotional distress.) Experience under the PLRA may lead to more general modifications—or, if too many good claims no longer can be vindicated, this experience may lead Congress to lift or adjust the cap for prisoners. The Constitution permits this sort of tinkering; it does not put the legislature to an all-or-none choice at the outset, before data can be collected.

The step-at-a-time corollary to the rational-basis standard tolerates the sort of inconsistency to which all systems of majority voting are prone. See Kenneth J. Arrow, *Social Choice and Individual Values* (2d ed. 1963). Suppose one-third of all legislators believe with Justice Brennan that no limit should be applied to awards of attorneys' fees in any constitutional suit; that one-third believe with Justice Rehnquist that awards in all constitutional suits should be limited to the amount (almost always less than the damages) that a solvent private litigant would be willing to pay for legal assistance; and that one-third believe that the plaintiffs with the lowest opportunity costs of time (which is to say, prisoners) should be required to substitute their own time for lawyers' time to some extent. Two-thirds of these legislators would agree with the proposition: "Prisoners and free persons should be treated alike with respect to recovering attorneys' fees from defendants." But though they would agree with an equal-treatment rule, they would not agree on the content of that rule. As a result, a proposal to reduce fees

in suits by prisoners would carry by a two-thirds majority, though a proposal to reduce fees across the board would fail. If that form of inconsistency can be called "irrational" and condemned as unconstitutional, then it is democracy itself that the Constitution forbids—because, as Arrow proved, inconsistency is an unavoidable consequence of decision by majority rule. The rational-basis approach tolerates this sort of legislative inconsistency by asking, not what legislators (or judges) actually believe, but whether it is *possible* for a sensible person to believe that the law does something useful. People could, and many do, believe that §1997e(d) does something useful.

## E

We have not yet mentioned two mainstays of Johnson's argument and the district court's holding: *Rinaldi v. Yeager*, 384 U.S. 305 (1966), and *Lindsey v. Normet*, 405 U.S. 56 (1972). Neither case supports the conclusion that §1997e(d) is invalid.

*Rinaldi* dealt with a law requiring prisoners—but not criminal defendants whose sentences had been suspended, or those fined but not sentenced to prison—to repay the cost of any transcripts prepared for use on direct appeal. The state apparently failed to offer any defense of this distinction (at least, the Justices did not discuss any proffered justification), and the majority held it to be irrational because inexplicable and unreasoned. Wisconsin and the United States *have* defended the line drawn by §1997e(d); as Part II.C demonstrates it is *not* an "unreasoned distinction" (384 U.S. at 310); and that is enough to show that *Rinaldi* does not undermine the PLRA. But there is more.

*Rinaldi* is among a series of decisions in the 1950s and 1960s that clear away what the Justices deemed to be obstacles to appeals by indigent criminal suspects.

See, e.g., *Griffin v. Illinois*, 351 U.S. 12 (1956); *Douglas v. California*, 372 U.S. 353 (1963). These and other similar decisions were revisited in *Ross v. Moffitt*, 417 U.S. 600 (1974), which concluded that *Griffin* and its successors rest more comfortably on the due process clause—because they determine what process states must afford to those accused of crime—than on the equal protection clause. Ever since *Ross* it has been understood that cases such as *Rinaldi* protect only the rights of defendants. This means principally criminal defendants, though occasionally the principle has some application to defendants in civil litigation of exceptional import, such as those that may terminate parental rights concerning their children. See *M.L.B. v. S.L.J.*, 519 U.S. 102 (1996). Neither *Rinaldi* nor any of the other cases in its sequence ever has been used to hold that the defendant must subsidize plaintiffs' civil litigation. That is why we held in *Lewis* that Congress may require civil plaintiffs to pay their own way.

As for *Lindsey*: the Court held that, consistent with the equal protection clause, a state may distinguish eviction suits from other litigation about property and may require tenants to post bonds for the rent accruing pending decision. 405 U.S. at 69-74. Indigent litigants unable to post bonds for accrued rent may lose the litigation summarily, the Court held, as far as the Constitution is concerned. These aspects of *Lindsey* strongly support the kind of distinctions drawn in the PLRA. The Court added in *Lindsey* that requiring the tenant to post a bond (to be forfeited in the event of affirmance) for *double* all accrued and impending rentals is irrational; double-or-nothing is a game of chance, not a mode of civilized litigation. *Id.* at 74-79. What *Lindsey* establishes is that forcing one party (in *Lindsey*, the tenant-defendant) to pay extra (double rent) to the adversary as a condition of receiving a decision on the merits violates the Constitution. If that holding has any resonance here, it casts a shadow on §1988

itself, for, as a condition of receiving a decision on the merits, Daley had to wager not only his own legal expenses but also Johnson's. We do not think that fee-shifting laws are problematic; they have been sustained many times, see *In re Mann*, 311 F.3d 788, 790 (7th Cir. 2002) (collecting cases); but nothing in *Lindsey* implies that fee-shifting ever is *required*.

Unlike the double-or-nothing statute in *Lindsey*, the PLRA does not compel the defendant to pay extra (compared with §1988) as a condition of receiving a decision on the merits. The district court turned *Lindsey* on its head, treating it as a *requirement* that one side subsidize the other by enough to ensure that litigation occurs. Nothing of the kind can be found in *Lindsey* (which, recall, held that a single-bond requirement is valid even for impecunious tenants) or in any other decision of which we are aware. If the American Rule is constitutional, which it is, there can be no doubt about the validity of the PLRA, which does not impose a "litigation tax" on prisoners but simply reduces the extent to which defendants must underwrite prisoners' suits.

The judgment of the district court is reversed, and the case is remanded for an award of attorneys' fees that complies with §1997e(d).

RIPPLE, *Circuit Judge*, concurring in the judgment. In my view, this case requires a straightforward application of the well-known and frequently applied rational basis test of constitutional analysis. When a classification is subject to this review, it is not appropriate for a court to second-guess "the wisdom, fairness, or logic of legislative choices." *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993). Only one issue is appropriately before us: Whether Congress could have believed that the classification implemented by the legislation had a rational relationship to some legitimate government purpose. *See id.* In conducting this inquiry, the classification "is accorded a strong presumption of validity," *Heller v. Doe*, 509 U.S. 312, 319 (1993), and must be upheld so long as there is some "reasonably conceivable state of facts that could provide a rational basis for the classification," *Beach Communications*, 508 U.S. at 313.

When Congress enacted the classification in question in this case, it had specific goals in mind: (1) to bring relief to a federal civil justice system that, in its view, was overburdened by meritless lawsuits brought by prisoners; and (2) to protect the public treasury from unwise expenditures. *See* 141 Cong. Rec. S14611-01, at S14626 (daily ed. Sept. 29, 1995) (statement of Sen. Hatch) ("This landmark legislation will help bring relief to a civil justice system overburdened by frivolous prisoner lawsuits."); 141 Cong. Rec. S7498-01, at S7524 (daily ed. May 25, 1995) (statement of Sen. Dole) ("[W]e have witnessed an alarming explosion in the number of lawsuits filed by State and Federal prisoners. . . . Frivolous lawsuits filed by prisoners tie up the courts, waste valuable judicial and legal resources, and affect the quality of justice enjoyed by the law-abiding population."); *id.* at S7526 (statement of Sen. Kyl) ("The volume of prisoner litigation represents a large burden on the judicial system, which is already overburdened by increases in nonprisoner litigation."); 141 Cong. Rec.

S14312-03, at S14317 (daily ed. Sept. 26, 1995) (statement of Sen. Abraham) ("[A]ttorney's fees must be proportionally related to the court ordered relief. No longer will attorneys be allowed to charge massive amounts to the State for the service of correcting minimal violations."). These are certainly legitimate government concerns, and it is certainly not open to us to second-guess the congressional judgment that there was a need to address these problems. Congress had a sufficient basis for its determination that the present state of civil litigation in the federal courts required legislative intervention.

Congress also had sufficient grounds for concluding that, with respect to civil rights litigation, prisoners present a unique situation that requires a particularized remedy. *See Boivin v. Black*, 225 F.3d 36, 44 (1st Cir. 2000); *Madrid v. Gomez*, 190 F.3d 990, 996 (9th Cir. 1999). The hardships of prison life, the prisoners' lack of any control over the conditions of their incarceration, the availability of a great deal of free time, and the absence of the usual economic disincentives in initiating legal action all combine to affect the type of litigation brought by prisoners, the frequency with which it is brought, and the manner in which it is presented to the courts. Although other conclusions reasonably might be drawn from the evidence, Congress was entitled to conclude that these factors lead prisoners to see high potential gains from bringing litigation and low opportunity costs associated with the venture. *See Boivin*, 225 F.3d at 44; *Madrid*, 190 F.3d at 996; *see also* 141 Cong. Rec. S7498-01, at S7526 (daily ed. May 25, 1995) (statement of Sen. Kyl) ("Unlike other prospective litigants who seek poor person status, prisoners have all the necessities of life supplied, including the materials required to bring their lawsuits. For a prisoner who qualifies for poor person status, there is no cost to bring a suit and, therefore, no incentive to limit suits to cases that have some chance of success."). Congress may well have

been dead wrong in coming to that conclusion, but we cannot say that the decision to view prisoners as presenting special problems requiring a special remedy was an irrational one.

Nor does the rational basis standard permit us to substitute our judgment for the determination of Congress with respect to the appropriate means to address the identified problems. One manner in which Congress chose to address the problem was by imposing restrictions on the attorneys' fees available for the successful prosecution of § 1983 litigation brought by a prisoner. This approach is certainly not the only way of addressing the prisoner litigation problem. Nor is it, in all probability, the best one. It may well be correct that the restriction on attorneys' fees, while discouraging attorneys from bringing frivolous cases, will hardly prevent the prisoners from bringing the same suits without the assistance of counsel. It also may turn out that the attorneys' fees restriction does more harm than good by discouraging attorneys from taking meritorious cases and thereby reducing the effectiveness of § 1983. Indeed, the restriction might increase the number of meritorious cases brought by prisoners without the assistance of counsel and therefore increase significantly the judicial resources needed to unravel the issues.

These concerns demonstrate the possibility that Congress might have misjudged the effectiveness of the remedy that it chose. That Congress may have made an unwise choice of remedy does not establish, however, that Congress acted irrationally. *See Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 316 (1976) (per curiam) ("[T]he State perhaps has not chosen the best means to accomplish [its] purpose. But where rationality is the test, a State 'does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect.'" (quoting *Dandridge v. Williams*, 397 U.S. 471, 485 (1970))). Congress may well have thought that, if lawyers

declined to take meritless lawsuits, prisoners, aware of other provisions, including the "three strikes" provision of the PLRA, would take the implicit advice in the attorney's decision and decide not to bring the cases on their own. *See Walker v. Bain*, 257 F.3d 660, 669 (6th Cir. 2001); *Hadix v. Johnson*, 230 F.3d 840, 845 (6th Cir. 2001). Congress also might have believed that, in the past, attorneys had brought a good number of meritless lawsuits in the hope that, despite the frivolousness of the suit, a recovery might be obtained. *See Jackson v. State Bd. of Pardons & Paroles*, 331 F.3d 790, 798 (11th Cir. 2003); *Walker,* 257 F.3d at 669; *Hadix*, 230 F.3d at 845. Congress may well have been wrong in making such estimations; at the very least, it may have overestimated the value of the attorneys' fees restriction as a remedy. But, in implementing the rational basis test, we are not grading the wisdom of the legislative branch. *See Heller*, 509 U.S. at 319; *Beach Communications*, 508 U.S. at 313. As long as our legislators could have had a rational basis for their action, we must allow their judgment to stand. We have no right to demand that Congress achieve a perfect, or even a near perfect, accommodation between means and ends. *See Heller*, 509 U.S. at 321 ("[C]ourts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends."). Indeed, Congress has the perfect right to experiment. It can implement a "solution," monitor its effectiveness and later determine to change course in its quest for a solution.

On this basis, I join the judgment of the court.

ROVNER, *Circuit Judge,* with whom EVANS, DIANE P. WOOD, and WILLIAMS, *Circuit Judges*, join, dissenting. In concluding that this PLRA provision satisfies rational relationship scrutiny, the majority as well as other courts have held that Congress could rationally believe the PLRA provisions furthered its interest in deterring frivolous or trivial litigation. The journey from the PLRA fee restrictions to the reduction in trivial or frivolous filings, however, requires so many leaps, many ridiculous, as to destroy any semblance of rationality. To believe that the fee restriction impacts the filing decision of *pro se prisoners*, Congress would have to believe that (1) prisoners would be inclined to bring frivolous or trivial lawsuits *and* (2) those prisoners would not be deterred from filing such suits by the likelihood that their own damages would be minimal or non-existent but (3) those prisoners would be deterred from filing those suits by the prospect that the fees available to their as-then non-existent attorneys were restricted under the PLRA even though (4) those attorneys would not have been entitled to fees for such suits even absent the PLRA and even though (5) the chances of those prisoners ever obtaining counsel was practically nil, given that only 1% of prisoner civil rights cases involve private attorneys, and another 4% involve appointed counsel (who presumably would not be appointed for our hypothetical trivial/frivolous cases). *See* Roger A. Hanson & Henry W.K. Daley, *Challenging the Conditions of Prison and Jails: A Report on Section 1983 Litigation* 21-22 (1995); *see, e.g.*, *McKeever v. Israel*, 689 F.2d 1315, 1320 (7th Cir. 1982) (in determining whether to appoint counsel, "the threshold question is whether the claim is of sufficient merit"). Such a belief is fanciful, not rational. In the alternative, to believe that the fee restriction impacts the decision of *private attorneys* bringing suits on behalf of such prisoners, Congress would have to believe that (1) there are private attorneys who are willing to bring suits on behalf of prisoners despite the difficult standards of

proof and the absence of traditional damages such as lost wages and future earnings and (2) those attorneys would file a trivial or frivolous lawsuit even though fees for such lawsuits are not available under § 1988 but (3) those same attorneys would decide not to file the law suit once fees were merely restricted under the PLRA. This sequence is made even more ridiculous considering that only 1% of all prisoner civil rights litigation involves private attorneys, including groups such as the ACLU, but yet we are asked to believe that Congress rationally could think those attorneys are choosing to bring the frivolous or trivial lawsuits and would be deterred from that course by the fee restriction under the PLRA but not the fee prohibition under § 1988. If this connection is a rational one, then this test truly has lost all meaning. The only impact this provision will have is on the meritorious prisoner actions, rendering it even more difficult for prisoners to adequately present these meritorious claims to the courts, and more difficult for the court to find counsel willing to accept appointments to represent prisoners in such cases. The government does not purport to have a legitimate interest in deterring prisoners from filing meritorious suits, nor could it, and therefore the provision is unconstitutional.

Rather than apply traditional equal protection analysis to the classification at issue here, as did all of the other circuits to consider this claim, the plurality opinion engages in a free-ranging discussion of myriad unrelated statutes under the mantra of answering the question "equal compared to what?" But the classification at issue here is not a mystery—the singling out of prisoners from the § 1988 fee structure available to all other civil rights litigants—and the sole issue in this case is whether that classification is rationally related to a legitimate governmental goal. Rather than addressing that question, the plurality examines a host of unrelated policy issues in-

cluding whether the fees available in civil rights actions are too generous as compared with those available in other causes of actions and whether prisoners are less worthy of benefits than other groups. Those are interesting issues for legislators or political candidates, but they are mere detours here, irrelevant to the equal protection claim before us. The plurality approach stands in stark contrast to that of the other circuits to consider the issue, which at least have engaged in a straightforward analysis of the classification and applied traditional equal protection analysis to the issue. The plurality opinion travels so far afield from equal protection jurisprudence in its opinion that before we can examine the rationality of the classification at issue here, we are compelled to clarify what is *not* at issue in this case.

## I.

First, no one claims that the right of access to the courts is a right of subsidized access. In demonstrating that there is no constitutional right to attorney's fees, the plurality opinion lists a number of constitutional rights for which there is no right of funding, but it is a point that is undisputed and therefore the discussion is gratuitous. This is not a case concerning whether prisoners, or any other persons, have a constitutional right to attorney's fees in civil litigation. The only issue here is whether, in granting fees to prevailing plaintiffs in civil rights actions, Congress may constitutionally single out one group of persons for differing treatment, and all parties (as well as the other circuits to consider the issue) agree that the rational relationship test is the appropriate one for analyzing that question.

Second, this case is not a forum to analyze whether attorney's fees should be available in civil rights litigation as a whole, whether such litigation is more important

than other types of litigation, or whether prisoners as a whole are a group less worthy of fees than "free persons." Although such a discussion in the current climate may well foster a visceral reaction of outrage (why should veterans have a lesser right to fees than prisoners!), it is an illusory comparison unrelated to the equal protection issue, and it foments the type of resentment towards a disfavored group that the equal protection clause is designed to address. It is difficult to understand why so much of the plurality opinion is devoted to a comparison of the fees available to prisoners in civil rights suits with the fees available to persons in miscellaneous other causes of actions. There is no constitutional requirement that fees be equal across causes of actions, nor is there any constitutional mandate that fees must be lower if a court deems the cause of action "less important" or the litigants "less worthy." Such a wide-ranging approach to the equal protection clause would transform courts into a "super-legislature." *See Heller v. Doe by Doe*, 509 U.S. 312, 319 (1993) (rational basis review in equal protection does not "authorize 'the judiciary [to] sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations'"). We are not the proper body to determine whether the spectrum of benefits afforded prisoners is more than those given veterans, or whether prisoners or any other group of persons are less deserving of benefits than veterans and therefore should get less. The end result of such an approach would be one that I suspect the majority would not endorse. Should we compare benefits afforded the elderly with those given to impoverished children? What about those given to senior citizens regardless of income as opposed to those provided to the working poor, or to the unemployed? Are we to judge who is more worthy? Of course not. The court ventures into that dangerous territory in comparing the fees available to prisoners with those provided *under other statutes*, a

comparison that has no basis in equal protection juris-prudence.

Moreover, the comparison is an illusory one for another reason. The PLRA applies to all civil rights actions by prisoners. This particular case happens to address the denial of appropriate medical care, which leads the plurality into a comparison with other unrelated statutes relating to medical care—including medical malpractice tort law, the FTCA, and Medicaid. But the case could have just as easily involved an entirely different field of law. Under the plurality's approach, if the civil rights claim concerned the conditions under which the prisoner was forced to live, we would examine all habitability provisions, or landlord-tenant laws. The logical extension of that approach would be that the constitutionality of the PLRA provision might well vary depending on the nature of the underlying lawsuit. The equal protection clause requires no such free-ranging examination of the fairness or wisdom of a provision in light of analogous but unrelated statutes. In fact, after raising the false comparisons, the plurality explicitly recognizes that the numbers upon which it bases much of its argument are "not directly comparable." Op. at 16.

The plurality in the end does not appear to be questioning the availability of attorney's fees to prisoners as much as the allowance of prisoner suits under § 1983 at all. Much of its analysis challenges why prisoners are allowed to litigate at all for deliberate indifference to their serious medical needs, comparing prisoners' litigation options to those of veterans and medicaid recipients among others. But that is not the subject of the PLRA provisions before us. We are concerned here only with the restriction on attorney's fees under the PLRA, not the wisdom of the varying litigation options among statutes, and therefore this discussion has no place in an equal protection analysis of the PLRA provision at issue here.

As we stated, the question "equal compared to what" is not answered by comparing prisoners in civil rights actions to litigants in unrelated causes of actions. For nearly all of those unrelated causes of action (i.e. malpractice tort law, the FTCA, etc.), all claimants filing suit under those actions are treated identically. Although there may be variations in the availability of fees among different causes of actions, there is no such discrepancy *within* a cause of action, with the exception of the IDEA which we will discuss shortly. The PLRA, however, creates just such a classification *within* a cause of action. Section 1988 grants attorney's fees to prevailing plaintiffs in civil rights litigation. The PLRA specifically targets those litigants, and creates a sub-group (prisoners) that will not have the same access to fees, stating that "[i]n any action brought by a prisoner . . . *in which attorney's fees are authorized under section 1988* [footnote omitted] of this title, such fees shall not be awarded except that . . . ." It is that classification between classes of individuals under § 1988 that must pass equal protection scrutiny.

An example may illustrate the fallacy of the plurality's approach. Suppose instead of limiting fees for prisoners, the PLRA reduced the availability of fees under § 1988 for all blue-eyed litigants. Under the plurality's reasoning, there would be no equal protection problem with that statute. The same arguments used to justify the restriction for prisoners would apply to blue-eyed litigants: blue-eyed civil rights litigants would still be "decidedly better off" under those fee restrictions than veterans under the FTCA or persons claiming benefits under the Social Security program; litigants in those other causes of action manage to obtain attorney representation so there is no reason to believe that equal fees are necessary for the blue-eyed civil rights litigants to do the same; civil rights litigation is not nearly as important as collateral attacks on a conviction, and there are less fees available there;

there is no constitutional right to attorney's fees; and finally, other statutes have widely divergent fee structures, and "what this means is that all of these different systems could be thought rational solutions." Yet most rational people would balk at the suggestion that Congress could, consistent with equal protection, single out persons with a certain eye color and deny them the same attorney's fees as all other litigants pursuing the same constitutional claims. That is because the detour into other causes of actions ignores the proper focus, which is on the classification itself viewed in the context of the statute authorizing fees for that particular cause of action. The classification must be rationally related to the legitimate governmental goal. That analysis is not even addressed until well into the plurality opinion, but it is the only relevant one for purposes of equal protection. The plurality's polemic may have (intuitive) appeal only because it exploits our own preconceptions about prisoners as a class and their worthiness—in other words, because it highlights why they are a disfavored group. But that tendency to act arbitrarily against a disfavored group is precisely the reason why the equal protection clause is necessary.

Only one of the examples offered by the plurality, that of the District of Columbia claimants under the IDEA, actually addresses a sub-group of litigants who were singled out for reduced fees as compared to others asserting the same cause of action. The D.C. Circuit in *Calloway* upheld that disparity only after determining that the classification was rationally related to the legitimate goal of addressing an acute funding need in the District. 216 F.3d 1. Notably, the court did not uphold the classification under the theory proposed by the majority that all fee structures vary and therefore all could be considered rational, nor did it uphold it because the fees that remained available were better than those afforded other groups such as veterans. Indeed, *Calloway* provides no

support for the theories presented in this majority opinion. A glance at *Calloway* is revealing in its contrast to the present case.

*Calloway* considered the constitutionality of a provision that limited the fees that the District of Columbia could pay to attorneys for prevailing parties in IDEA lawsuits. The reason for singling out District of Columbia litigants from all other IDEA litigants was clear from the record, which demonstrated that in one year alone, "although the DCPS [District of Columbia Public Schools] served less than two-thousandths of one percent of the nation's disabled students, over forty-five percent of requests for due process hearings nationwide were made in D.C." *Id.* at 4. Because attorney's fees were available under the IDEA, legal representation in D.C. had grown from an obscure niche into a booming, lucrative industry, costing the DCPS over $10 million in attorney's fees in fiscal year 1998. *Id.* The Secretary of Education had determined that immediate compliance by the DCPS with the requirements of the IDEA was not feasible because the root causes of its failures were so extensive; the Secretary had thus entered into a compliance agreement with DCPS mandating full compliance within three years. *Id.* Against this unusual background, Congress acted to reduce the amount of attorney's fees available for IDEA actions in D.C. The D.C. Circuit considered whether the classification at issue there—the singling out of D.C. litigants from other IDEA litigants—was rationally related to a legitimate governmental goal. The government argued that "in view of DCPS's manifest inability to meet its obligations under IDEA, Congress could rationally have concluded that 'it was more important for the District to spend its funds on remedying those systemic defects and providing primary services rather than upon litigation fees.'" *Id.* at 8. The D.C. Circuit held that Congress could rationally believe that limiting payments to attorneys

would leave more funds available for direct services, and that assisting disabled children by allocating funds towards primary educational services rather than attorney's fees was a legitimate governmental goal. *Id.* at 8-9. Accordingly, the provision survived equal protection scrutiny.

The plurality opinion establishes no similar connection between reduced attorney's fees in prisoner civil rights litigation and any legitimate governmental goal. Unlike *Calloway*, there is no booming, lucrative business in the prisoner segment of civil rights litigation. With only 1% of all prisoner civil rights cases even involving attorneys not appointed by the court, that can not possibly be identified as a fee drain out of proportion to the other litigants under the civil rights statutes. It is that connection between *attorney's fees* and a legitimate governmental goal that the plurality never makes, choosing instead to devote much of the opinion to a condemnation of prisoner civil rights litigation generally (without regard to attorney representation or fees) or decrying the extent of fees available in civil rights actions generally as compared with other causes of actions that the majority appears to deem more significant. The Equal Protection Clause, however, addresses the fit between the particular classification and the legitimate governmental goal, and that is lacking here.

In a late effort to tie its discussion to traditional equal protection analysis, the plurality declares that the other statutes with lesser attorney's fees are relevant comparisons because litigants under those statutes do not have difficulties obtaining counsel, and therefore Congress could assume that prisoners under a more favorable statutory structure would not either. That comparison is so superficial as to be meaningless. First, as has been mentioned, the focus on medical cases is misplaced, because the PLRA limits fees in all types of prisoner civil rights actions. Moreover, damages cannot be compared with any meaning

in prisoner versus non-prisoner litigation, because the absence of earning capacity in the former necessarily skews the damages. This case is a good example of the discrepancy. Diagnosed with end stage liver disease, Johnson lapsed into a coma multiple times. In February 1996, he was examined by Dr. Alexandru Musat, medical director of the Liver Transplantation Program at the University of Wisconsin Hospital, who recommended that Johnson should be evaluated to determine whether he was an appropriate candidate for a liver transplant, as "the only viable option for resolution of his symptoms and liver failure." Without a liver transplant, Dr. Musat estimated that Johnson's life expectancy would be in the range of three to four years.

The defendant Dr. George Daley, the medical director of the Bureau of Correctional Health Services for the Wisconsin Department of Corrections, refused to authorize that evaluation. On a number of subsequent occasions, Dr. Daley denied written requests from two prison doctors seeking authorization for the treatment recommended by Dr. Musat. Johnson then filed suit pursuant to 42 U.S.C. § 1983 alleging that Dr. Daley denied him adequate medical care for his liver disease in violation of the Eighth Amendment. In July 1998, the district court dismissed that action without prejudice for failure to exhaust administrative remedies, but the complaint was reinstated in December 1998, after Johnson satisfied the exhaustion requirement. In April 1999, Dr. Daley finally approved the request to have Johnson evaluated by the University of Wisconsin for a liver transplant, and in June 1999, the University of Wisconsin Hospital, with the approval of Dr. Daley, placed Johnson's name on the list as a potential recipient for a donated liver. The case proceeded to trial on the issues of whether the initial denials of the evaluation constituted deliberate indifference to Johnson's serious medical needs and whether the three-year delay in evaluation and placement on the transplant list caused him any harm.

Despite the length of the delay and the clear risk to Johnson's life, recognized even by the prison doctors, Johnson was awarded only $10,000 in compensatory damages and $30,000 in punitive damages, amounts that undoubtedly would have been much higher were he not a prisoner. Even the plurality opinion reflects the devaluation of a prisoner's life, stating dismissively that "he appears to have suffered no long-term injury from the delay," but that "[n]onetheless, a jury agreed with Johnson . . . and awarded him . . . damages." I doubt that the plurality would be so cavalier about a three-year delay in being placed on a transplant list if it were they or a loved one awaiting a life-saving procedure, and the plurality opinion fails to mention that but for the lawsuit, Johnson would probably still not be on the transplant list.

The reality is that both the deep-seated societal antipathy towards prisoners as a class as well as the absence of lost wages or future earnings damages ensures that damages in prisoner cases will nearly always be minimal. *See* Roger A. Hanson & Henry W.K. Daley, *Challenging the Conditions of Prison and Jails: A Report on Section 1983 Litigation* 37 (1995) (recognizing that prisoner settlements and verdicts are smaller because wages are nonexistent and a substantial component of compensatory damages is either lost wages or foregone earnings). More fundamentally, the comparison with the other statutes is flawed in its extrapolation of the experience under other statutes to this context. The plurality concludes that if attorneys are widely available under statutes with less liberal fee provisions, Congress could conclude they would be widely available under the PLRA. But even pre-PLRA, attorneys were rarely available to prisoners. Prisoners are represented by attorneys in only 4% of all prisoner litigation, and the vast majority of those attorneys are court appointed. Because attorneys were scarce in

prisoner civil rights litigation even before the PLRA reduced the fees, the comparison to other statutes is meaningless.

The plurality opinion raises a host of other questionable arguments, not the least of which is that all prisoners are liars and all of their cases lost are lost because they lied. It is difficult to imagine any other group of persons for whom such sweeping (and unsupported) generalizations would be tolerated, let alone given credence, in a judicial opinion. Nevertheless, the generalizations do not further the plurality's argument. In fact, many of those alleged prisoner traits posited by the plurality would demonstrate that their filing decisions are entirely unaffected by attorney's fees. There is, for instance, no reason to believe that prisoners motivated to file lawsuits to get a day away from prison, to pass the time, or to harass prison staff, will be moved to abstain from such conduct by the prospect that their hypothetical future attorney will receive less in fees if the suit is successful. But that is precisely the basis of the rationality analysis offered by the plurality. The plurality further uses these preconceptions about character to engage in an even more fanciful calculation of the hypothetical effects of the PLRA on prisoner behavior. For instance, assuming all prisoners are liars, the plurality postulates that a frivolous case often will not be recognized as such until the trial, but that ignores the reality that the vast majority of prisoner cases are resolved without an evidentiary hearing. *See* Roger A. Hanson & Henry W.K. Daley, *Challenging the Conditions of Prison and Jails: A Report on Section 1983 Litigation* 22 (1995) (noting that evidentiary hearings are not held in 97% of cases). The calculations are in large part based on unsupported assumptions and unrecognized factors. For instance, from the statistic that prisoners lose 90% of all fully tried cases, the majority then assumes that 9 out of 10 prisoners making claims are lying, and only 1

out of 10 guards is lying. That is unsupportable. Only 3% of cases reach evidentiary hearings or trials. *Id.* In the 97% that do not, courts assume the prisoners are truthful in their allegations but find that prisoners nonetheless lack the support necessary to satisfy the relatively demanding prerequisites to relief (i.e., in medical cases, prisoners need to demonstrate not mere malpractice, but deliberate indifference to a serious medical need). For the overwhelming majority of cases, then, there is no basis to assume that the case is lost because the prisoner is lying. Likewise, of the cases that go to trial, there is no reason to believe that the lack of success establishes that the prisoner was lying as opposed to the possibility that the prisoner lacked the corroboration to support a claim or simply could not meet the high burden, but in any case 90% of 3% is only 2.7%. All of the expected recovery calculations flow from that false assumption.

The potential reduction in litigation that the majority portends as a result of these PLRA provisions is similarly baseless. For instance, the majority concludes that the PLRA fee restrictions will reduce the percentage of prisoners filing cases, but does not consider whether that decrease, by making it less risky for guards to engage in unconstitutional behavior, will increase such behavior and therefore offset some of that alleged "gain." In any case, the calculations are far removed from the issue here and the reality of filing decisions in the prison context. Furthermore, the majority declares that "even if 80% of prisoners are insensible to changes in the litigation process, different behavior by the other 20% would be welcome." Given that only 4% of prisoners will ever be represented by counsel, the 20% prediction is baseless. When we further consider that the vast majority of those 4% involve appointed counsel and therefore are cases that the court does not consider trivial, it becomes clear that the cases potentially deterred are not the trivial ones in

which the government claims an interest, but the meritorious ones in which it does not. *McKeever*, 689 F.2d at 1320 (in determining whether to appoint counsel, "the threshold question is whether the claim is of sufficient merit"). No amount of statistical shell games can rationally establish otherwise.

We turn, then, to the only issue presented here—the connection between the classification and the legitimate governmental interest. A proper application of the rational relationship test renders the PLRA fee restrictions unconstitutional.

## II.

We begin our analysis with a brief explanation of the genesis of the PLRA provisions. The PLRA was enacted in response to a veritable flood of prisoner litigation, most of it without merit, that clogged up the dockets of federal courts and drained resources away from meritorious cases. The magnitude of the problem was apparent. *See, e.g.*, *Roller v. Gunn*, 107 F.3d 227, 230 (4th Cir. 1997) ("In 1995, prisoners brought over 25% of the civil cases filed in the federal courts. In this circuit alone, *in forma pauperis* (IFP) filings accounted for almost half of the court's 1995 caseload and prisoners were responsible for 75% of those filings.") (citations omitted); *Boivin v. Black*, 225 F.3d 36, 41 (1st Cir. 2000). In addressing this problem, Congress recognized that the unique circumstances of prison life provided a breeding ground for frivolous litigation. Inmates have a great deal of time on their hands, and no disincentive to spend it filing suits. Although a court appearance is a nuisance and often a real hardship on a nonincarcerated person, who must arrange for time off from work or child care, the inmate has no such concerns. To the contrary, a trip to the courtroom is a benefit for an inmate who is otherwise confined to a cell. In addition, the

availability of IFP status, as well as the provision of all the inmate's daily needs in prison, removed any financial impediment to litigation. As a result, the type of cost-benefit assessment in which a non-prisoner might engage, to determine whether the constitutional issue was worth the effort and cost of pursuing federal court relief, was artificially skewed in the context of the prison suits. *See Hadix v. M. Johnson*, 230 F.3d 840, 844 (6th Cir. 2000); *Boivin*, 225 F.3d at 44; *Tucker v. G. Branker,* 142 F.3d 1294, 1300 (D.C. Cir. 1998); *Mitchell v. Farcass*, 112 F.3d 1483, 1488-89 (11th Cir. 1997); *Roller*, 107 F.3d at 234. Congress responded to that problem by enacting the PLRA in an attempt to redress the epidemic of frivolous prisoner litigation.

We have already upheld a number of PLRA provisions as constitutional. *See, e.g.*, *Lewis v. Sullivan*, 279 F.3d 526 (7th Cir. 2002) (holding constitutional PLRA requirement that prisoners prepay filing fees if they have a history of frivolous litigation except where under imminent danger of serious physical injury); *Zehner v. Trigg*, 133 F.3d 459 (7th Cir. 1997) (holding constitutional PLRA limitation that forbids recovery for mental or emotional damages without a prior showing of physical injury). Although we have upheld those provisions against equal protection challenges, each PLRA provision must be examined on its own merits.

We are concerned in this case only with §§ 1997e(d)(2) & (3), which provide that in cases brought by an inmate in which fees are authorized under § 1988, the award of attorney's fees is limited to 150% of the amount of judgment, § 1997e(d)(2), and the hourly rate payable to a prisoner's attorney is restricted to 150% of the hourly rate allowed for court-appointed counsel in criminal cases under the Criminal Justice Act (18 U.S.C. § 3006A), § 1997e(d)(3) (collectively referred to as "the PLRA fee restrictions").

Because those PLRA fee restrictions apply only to cases in which fees are authorized under § 1988, in order to assess the equal protection challenge we first must place those provisions in the context of the fees otherwise available under § 1988. See § 1997e(d); *Martin v. Hadix*, 527 U.S. 343, 363-64 (1999) (Scalia, J., dissenting) ("[i]n reality . . . the PLRA simply revises the fees provided for by § 1988, and it seems that the underlying purpose of *that* provision must govern its amendment as well—which purpose was to provide an appropriate incentive for lawyers to work on (among other civil rights cases) prisoner suits."); *Heller v. Doe by Doe*, 509 U.S. 312, 321 (1993) ("even the standard of rationality as we so often have defined it must find some footing in the realities of the subject addressed by the legislation"). *See also Romer v. Evans*, 517 U.S. 620 (1996) (analyzing amendment in light of pre-existing law to determine that rational relationship test was violated); *Lindsey v. Normet*, 405 U.S. 56, 78 (1972) (analyzing the statutory double-bond requirement in the context of the pre-existing state statutes); *Reitman v. Mulkey*, 387 U.S. 369, 373 (1967) (in equal protection challenge to state constitutional provision, court should consider its "'immediate objective,' its 'ultimate effect' and its 'historical context and the conditions existing prior to its enactment.'"). In enacting § 1988, Congress recognized that civil rights actions for damages are distinct from private tort suits that benefit only the individual plaintiffs. Unlike ordinary tort litigation, civil rights suits "vindicate important civil and constitutional rights that cannot be valued solely in monetary terms." *City of Riverside v. Rivera*, 477 U.S. 561, 574 (1986). Congress determined that many victims of civil rights violation were unable to obtain representation in the private market because of high attorney fees, and therefore § 1988 provides for payment of a reasonable fee—that is, "a fee large enough to induce competent counsel to handle the

plaintiff's case, but no larger." *Simpson v. Sheahan*, 104 F.3d 998, 1002 (7th Cir. 1997).

Consistent with that purpose, § 1988 allows for the award of fees only to "prevailing parties." In order to be considered a prevailing party, the plaintiff must have obtained some judicially sanctioned relief on the merits of the claim. Specifically, a plaintiff prevails when actual relief on the merits of the claim, provided by a court judgment or consent decree, materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff. *Buckhannon Bd. and Care Home, Inc. v. West Virginia Dept. of Health and Human Resources*, 532 U.S. 598, 604 (2001); *Farrar v. Hobby*, 506 U.S. 103, 111-112 (1992); *Simpson*, 104 F.3d at 1001. Once that hurdle is surmounted, a court may award fees but only in an amount that is reasonable in light of the degree of overall success. *Farrar*, 506 U.S. at 114. Where a plaintiff is a prevailing party but the success is merely technical or de minimis, the presumption is that no fees should be awarded. *See id.* at 115 (where the plaintiff recovers only nominal damages "the only reasonable fee is usually no fee at all"); *Cole v. Wodziak*, 169 F.3d 486, 488 (7th Cir. 1999) ("a paltry jury award . . . implies that the only reasonable fee is zero"); *Monticello School Dist. No. 25 v. George L. on Behalf of Brock L.*, 102 F.3d 895, 907 (7th Cir. 1996) ("when a plaintiff's success is simply technical or de minimis, no fees may be awarded, even if the plaintiff has succeeded on an issue in the litigation and may thus be technically a 'prevailing party'"); *Maul v. Constan*, 23 F.3d 143, 145 & 147 (7th Cir. 1994) (award of attorney's fees is inappropriate where victory is de minimis).

The ultimate question in entitlement to fees under § 1988, therefore, is whether the plaintiff's victory is significant or merely de minimis. *Maul*, 23 F.3d at 145. In recognition that "[n]ominal relief does not necessarily a

nominal victory make," *Farrar*, 506 U.S. at 121 (O'Connor, J. *concurring*), courts may award fees in cases of minimal damages only if other factors establish that the victory, although monetarily small, is actually a significant one. In making that assessment, we look to the three factors set forth in Justice O'Connor's concurrence in *Farrar*: "(1) the difference between the judgment recovered and the recovery sought; (2) the significance of the legal issue on which the plaintiff prevailed; and (3) the public purpose of the litigation." *Farrar*, 506 U.S. at 122; *Simpson*, 104 F.3d at 1001; *Briggs v. Marshall*, 93 F.3d 355, 361 (7th Cir. 1996). Where those factors establish that the victory is not de minimis but is instead significant, fees may be available under § 1988. If those factors are not met, then the plaintiff achieved only a technical or de minimis victory and fees are unavailable under § 1988. Of course, if a case is frivolous, no fees can be awarded under § 1988, and in fact plaintiff and plaintiff's counsel can be sanctioned for the pursuit of such a suit. *Farrar*, 506 U.S. at 111-12.

## III.

With that background, I turn to the constitutionality of the PLRA fee restrictions. The parties agree that the appropriate level of review is the rational relationship test because the challenged provisions do not impact fundamental rights and the prisoners do not constitute a suspect class which would have triggered a higher degree of scrutiny. The issue, therefore, is whether those PLRA fee restrictions are rationally related to a legitimate governmental interest. Although the district courts have diverged on the issue, the federal appellate courts that have considered the rationality of the PLRA fee restrictions have upheld them or split on the question. The Third Circuit sitting *en banc* split evenly on the issue,

which had the effect of upholding the provisions as constitutional because the district court had so held. *Collins v. Montgomery County Bd. Of Prison Inspectors*, 176 F.3d 679, 686 (3d Cir. 1999). The First, Sixth, Eighth, Ninth, and Eleventh Circuits held the provisions constitutional. *Boivin v. Black*, 225 F.3d 36 (1st Cir. 2000); *Hadix v. Johnson*, 230 F.3d 840 (6th Cir. 2000) and *Walker v. Bain*, 257 F.3d 660 (6th Cir. 2001); *Foulk v. Charrier*, 262 F.3d 687 (8th Cir. 2001); *Madrid v. Gomez*, 190 F.3d 990 (9th Cir. 1999); *Jackson v. State Board of Pardons and Paroles*, 331 F.3d 790 (11th Cir. 2003). Those opinions are deserving of careful attention. Nevertheless, the split in the Third Circuit *en banc* and the dissents in the Sixth Circuit cases caution against a rush to judgment, and *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *McNally v. United States*, 483 U.S. 350 (1987), both of which overruled nearly uniform lower court precedent, certainly illustrate that strength of numbers does not always signify an analysis convincing to the Supreme Court. *See Buckhannon*, 532 U.S. at 621 (noting that "our disagreeing with a 'clear majority' of the Circuits is not at all a rare phenomenon. Indeed, our opinions sometimes contradict the unanimous and long-standing interpretation of lower federal courts.").

We begin with the interests that animate the PLRA fee restrictions. The government and Dr. Daley propose five possible governmental interests furthered by the fee provisions, which mirror the interests asserted in the other circuit cases. It does not matter whether Congress had those interests in mind when enacting the PLRA fee restrictions, or whether they are mere conjecture, because Johnson must negate every conceivable basis which might support the legislation whether or not the basis has any foundation in the record. *Heller*, 509 U.S. at 320. The PLRA fee restrictions purportedly are related to the government's interest in: (1) deterring the filing

of frivolous claims; (2) regulating the filing of suits predicated on trivial harms; (3) protecting the public fisc; (4) regulating federal court intervention into States' management of their prison systems; and (5) preventing windfall fee awards. We will consider these in turn.

Two of the circuits as well as the concurrence here uphold the fee restrictions based solely on the governmental interest in deterring frivolous litigation. In the Ninth Circuit case of *Madrid*, the inmates acknowledged that the government had a legitimate interest in deterring frivolous filings, but maintained that it was not rational to distinguish between inmates and non-inmates in furtherance of that goal. 190 F.3d at 996. The court rejected that argument, holding that the government could rationally believe that prisoners are responsible for the majority of frivolous suits, and therefore could classify on that basis. *Id.* That argument is in fact consistent with our decision in *Lewis*, 279 F.3d at 528-29, and with the decisions of many other circuits upholding the constitutionality of the filing fee provisions of the PLRA. Congress could well have determined that inmates are responsible for a disproportionate percentage of frivolous litigation in the federal courts, and could properly create a disincentive to such filings, as by holding them responsible for the filing fees. In *Madrid*, the court held that Congress could rationally distinguish between inmates and laypersons in its effort to deter frivolous litigation.

The parties here concede *Madrid*'s point that the government has a legitimate interest in deterring frivolous litigation, and that Congress could properly focus that effort on inmates who are disproportionately responsible for the problem. Johnson maintains, however, that the PLRA fee restrictions at issue here are not rationally related to that goal—in other words, that the fit between the end and the means is so attenuated as to render the restrictions arbitrary. The *Madrid* court never addressed

that more critical issue of whether this particular classification—the attorney fee restriction—is related to that goal.

The First Circuit in *Boivin* faced a challenge more analogous to the one before us. In that case, Boivin presented "in skeletal form" an argument that there was a "complete lack of fit between the means that Congress chose (capping attorney's fees) and the end that it sought to achieve (reducing frivolous prisoner litigation)." 225 F.3d at 44-45. The First Circuit understood the argument to be that the fee cap would not deter the filing of frivolous actions because fees are awarded only to prevailing parties. The *Boivin* court rejected that argument:

> [c]ommon sense suggests that this *ex post* view is untenable. Congress presumably feared the motivating effect of the prospect of attorneys' fees, *ex ante*, and the fee cap quells that effect by capping the potential payoff. This changes the odds, and forces both lawyer and client, out of self-interest, to assess likely outcomes with greater care before filing a suit that, even if nominally successful, might leave them holding a nearly empty bag.

*Id.* at 45. The court's "*ex post*" and "*ex ante*" distinction, however, fails to recognize that the PLRA fee restrictions do not impose any added disincentive *ex ante* to the filing of frivolous litigation, because § 1988 already prohibits fees for such litigation. *Boivin* theorizes that Congress feared that potential attorney's fees could provide motivation for litigation. It then holds that the prospect of a limited fee may alter that analysis at the beginning, thus diminishing frivolous litigation. That assumes an initial assessment by the inmate of the strength of the case, because the fee recovery under the PLRA is tied to the damages attained. If § 1988 authorized the payment of fees for even frivolous litigation, then the PLRA fee restrictions would indeed reduce the motivation for filing

that such fee availability provides. Just the opposite is true, however.

Under § 1988, no fees are possible for a frivolous case, and in fact sanctions may be imposed for such litigation. Therefore, the PLRA fee restrictions, by their very terms, are inapplicable to such a case, because those restrictions apply only to inmate cases "in which attorney's fees are authorized under section 1988." *See* § 1997e(d)(1) & (2). In addition, the § 1988 provisions deny all fees for frivolous litigation, thus imposing a greater disincentive *ex ante* to filing than the PLRA fee restrictions themselves would impose. The First Circuit failed to answer how an inmate filing frivolous litigation would be motivated to withdraw it by the prospect that he could obtain only 150% of the judgment as fees, when the law prior to the PLRA already established that he could obtain no fees at all for such litigation. If the goal is to reduce frivolous litigation, the PLRA fee restriction adds nothing to the equation. The law under § 1988 already removed the prospect of any fees in such circumstances, and therefore any contemplative effect that potential fees might have on the filing decision was already fully leveraged by § 1988. Given the prohibition on fees under § 1988 for frivolous litigation, the PLRA fee restrictions have no impact whatsoever on the filing of frivolous litigation that is not already provided by § 1988. The language of the statute acknowledges that by limiting the PLRA fee restrictions to cases in which fees are authorized under § 1988. Instead, the impact of the PLRA fee restrictions *ex ante* is only on the inmate contemplating the filing of non-frivolous litigation in which fees are potentially available under § 1988. *See Hadix*, 230 F.3d at 844 n.3 ("with respect to truly frivolous claims, it could be plausibly argued that the provision would have at best a very attenuated effect on the litigation decision of a pro se inmate, whose claims must be certified as possessing at least

some merit at an early stage in the litigation. Further, the fee cap provisions only apply to cases in which the prisoner has actually prevailed, thereby assuring that at least one claim was meritorious."). The government, however, does not and cannot argue that Congress has a legitimate interest in discouraging meritorious litigation by inmates.

In recognition of the weakness of the frivolousness argument, the Sixth, Eighth, and to some extent the Eleventh Circuits rested their decisions on the second asserted governmental interest—that of decreasing marginal or trivial lawsuits. I will assume for purposes of this dissent that the government may have a legitimate interest in decreasing the number of meritorious civil rights suits that involve trivial harms. The government links its interest in decreasing trivial litigation with the fee restrictions by opining that: (1) the fee restrictions will provide a disincentive that did not previously exist for an attorney to take a case involving trivial violations; (2) this will increase the likelihood that attorneys will decline to take such cases and (3) that prospect will in turn cause inmates to refrain from filing such cases because they will have to proceed *pro se*, or it will cause them to abandon their suits when unable to obtain representation.

Again, however, the PLRA adds no restriction on fees that was not already present under § 1988, and therefore does not add a disincentive for the prisoner to file that trivial litigation. For the same reason, the PLRA fee restrictions would not impact an attorney's decision to file a frivolous or trivial suit in the first place. Under either the PLRA or § 1988, that attorney would need to initially assess the potential for fees before filing such a case, and because § 1988 already prohibits fees in a frivolous or trivial suit, the PLRA does not create any additional disincentive to filing such suits. All the PLRA does is to notify attorneys filing frivolous prisoner civil rights actions that they will get a maximum of 150% of zero

instead of zero. The Sixth Circuit in *Hadix* and *Walker* failed to analyze the PLRA restrictions in the context of § 1988 fees generally, and therefore did not address whether the PLRA fee restriction added any disincentive that was not already provided by § 1988 fee restrictions. Because the Eighth Circuit's analysis consisted entirely of a quote from *Walker*, and the Eleventh Circuit merely quoted *Walker* and *Hadix* without separate analysis, those decisions manifest the same shortcoming. The § 1988 context is critical, however, in determining whether the means are rationally related to the ends; the search for a link between the classification and objective is what gives substance to the requirement of equal protection. *Romer*, 517 U.S. at 632-33 (to survive rational relationship scrutiny, the law must be "narrow enough in scope and grounded in a sufficient factual context for us to ascertain some relation between the classification and the purpose it served").

The PLRA fee restriction, placed in the context of the § 1988 remedy that it modifies, fails to cross the first step in the three-step sequence that would supposedly reduce the volume of trivial litigation, because it does not provide a disincentive *that did not previously exist* for an attorney to take a case involving trivial violations. That is because attorney's fees are already presumptively unavailable in cases involving trivial or de minimis violations. *See* discussion *supra* at 16-18. Only where other factors establish that a seemingly minimal victory was actually significant, as where it involves a significant legal issue and serves an important public interest, will fees be available for a case that would otherwise be considered trivial or de minimis. *Farrar*, 506 U.S. at 122; *Simpson*, 104 F.3d at 1001. The government does not argue, nor could it, that it has a legitimate interest in discouraging the filing of constitutional claims involving a significant public interest. Therefore, that exception

is inapplicable. We are left with the pre-existing § 1988 law that presumes that no fees are available for cases involving de minimis or trivial harms. Therefore, before the PLRA, an inmate deciding whether to file a lawsuit would be presented with the prospect of attorney's fees for meritorious cases involving significant harms, but with no fees available if the suit prevailed but involved only trivial harms, and with no fees and possibly sanctions if the suit was frivolous. The PLRA fee restrictions do nothing to alter the status quo for the inmate who brings the frivolous or trivial suit. It serves only to create a significant disadvantage for those presenting significant, meritorious challenges. Once again, however, the government does not allege that it has a legitimate interest in deterring the filing of such meritorious suits, nor does it argue that prisoners as opposed to others are responsible for more of those suits or are otherwise a proper class to single out for such a goal.

Even if fees were available under § 1988 to attorneys representing prisoners in trivial civil rights actions, the subset of cases in that category impacted by the PLRA fee restrictions is so small that it may actually be zero. We begin with the reality that only 1% of all prisoner cases even involve private attorneys. The other 4% involve appointed counsel, and by definition courts do not appoint counsel in trivial cases. Within that 1% of cases, we are asked to believe that some of those cases are trivial but that an attorney nonetheless agreed to represent the prisoner, that the attorney would not be deterred from filing by the prospect of little or no fees under the "qualitative" restriction of § 1988, but that the attorney will be deterred by the "quantitative" restriction of the PLRA. There is no reason to believe that any cases fall within that hypothetical reach.

The district court, faced with the reality of prisoner litigation on a daily basis, was skeptical of this line of

reasoning. The court noted that "in nearly 100%" of prisoner cases involving representation, the attorneys were appointed by the court, and that of the 1,980 prisoner civil rights cases filed in the Wisconsin federal courts between January 1995 and September 1999, only 2.5% had counsel appointed. *Johnson v. Daley*, 117 F. Supp.2d 889, 898 (W.D. Wis. 2000); *see also* Roger A. Hanson & Henry W.K. Daley, United States Dept. of Justice, Bureau of Justice Statistics, *Challenging the Conditions of Prisons and Jails: A Report on Section 1983 Litigation*, at 21-22 (Table 6) (Dec. 1994) (recounting that 96% of prisoner civil rights actions are filed *pro se*, with attorneys appointed in approximately 4% and private attorneys in approximately 1% of the cases). The court noted that in its thirty years of handling prison civil rights cases, it could think of none that were attorney initiated. 117 F. Supp.2d at 898. The court concluded that the asserted connection between the filing decision and attorney's fees was too tenuous:

> At the heart of defendant's argument is the idea that prisoners perform a cost-benefit analysis in deciding whether to file a lawsuit, weighing a variety of factors. Although it is reasonable to assume that a pro se prisoner does do this, it is irrational to conclude that he bases his decision on the distant possibility that at some future time, his presently non-existent lawyer might recover a smaller rather than a larger amount of fees.

*Id.* at 896. The court further noted that although the purported goal was to discourage frivolous cases, there was "no chance" of counsel being appointed in frivolous cases, and accordingly the only prisoners affected by the fee provisions were those who filed meritorious complaints for whom the court could not secure counsel because of the limited fees available under the PLRA. Congress' goal of reducing the burden of prisoner suits on federal courts would be ill-served by a fee restriction that

forced district courts to plod through *pro se* filings in meritorious cases because of the inability to obtain appointed counsel. The reality in which the fee restrictions operates negated the purported connection between the classification and the goals. *Id* at 900; *see Heller*, 509 U.S. at 321(noting that "even the standard of rationality as we so often have defined it must find some footing in the realities of the subject addressed by the legislation").

On the other hand, the PLRA fee restrictions have a very direct, foreseeable, and inevitable impact on the meritorious actions filed by attorneys, whether appointed or privately retained. Where the relation with the alleged governmental interest is that dubious, and the impact on an unrelated class of meritorious cases so obvious and severe, no rational connection exists between the classification and the purported interest.

I must emphasize that we are not concerned here with the possibility that the PLRA fee restrictions are merely cumulative of provisions in § 1988. Statutes do not violate equal protection solely because they overlap somewhat with other pre-existing remedies. The problem in this case is that the government interest justifying the classification is in the deterrence of frivolous and trivial suits, yet the PLRA restrictions will not even apply to such suits. The language of the PLRA clarifies that the fee restrictions apply to actions in which § 1988 fees are authorized, thus making the contours of § 1988 the starting point in the analysis. Because no fees are available for frivolous or trivial cases, the PLRA fee restrictions will never apply to such cases, and therefore the governmental interest in deterring those cases is wholly inapposite.

Although the fit between means and ends need not be perfect, there must be *some* fit in order for the legislation to survive rational relationship scrutiny. If the inter-

est is in deterring frivolous and trivial litigation, but the legislation impacts only non-trivial meritorious litigation, that fit is lacking. The present case bears witness to the lack of fit between the fee restrictions and the deterrence of frivolous litigation. Johnson's meritorious claim concerned actions which placed his life in danger. His claim cannot be characterized as trivial under any definition of that term. Nevertheless, he presented evidence to the district court that at least four private attorneys refused to take his case, and he obtained representation only after counsel was appointed for him by the district court. That attorney, having accepted the appointment from the court, is now faced with the prospect of recovering fees which are inadequate to compensate for the effort reasonably expended and the risk undertaken, and that meager compensation is attributable solely to the status of the client as incarcerated rather than to the relative merit of the claim. Of course, a statute does not fail the rational relationship test solely because its imprecise reach impacts persons beyond those within its legitimate interest. Neither, however, can we analyze the claim in some kind of Never-Neverland, where the context and the actual reach of the statute are ignored. *See Romer*, 517 U.S. at 632-33 (to survive rational relation scrutiny, law must be grounded in sufficient factual context for Court to ascertain some relation between the classification and the purpose it serves); *Heller*, 509 U.S. at 321("even the standard of rationality as we so often have defined it must find some footing in the realities of the subject addressed by the legislation"); *Lindsey*, 405 U.S. at 78 (analyzing the statutory double-bond requirement in the context of the pre-existing state statutes). The PLRA fee restrictions go well beyond being somewhat under-inclusive or overinclusive; rather, essentially all of the interests that the restrictions allegedly target are excluded from its reach by § 1988, whereas the PLRA fee restrictions have a direct, foreseeable impact on the class

of litigation in which Congress claims no interest. *Burlington Northern R. Co. v. Ford*, 504 U.S. 648, 653 (1992) (recognizing that equal protection clause is violated if the underinclusiveness and overinclusiveness is so great that the rules can no longer be said rationally to implement the policy judgment); *Romer v. Evans*, 517 U.S. 620, 632 (1996) (amendment fails rational relationship test where "its sheer breadth is so discontinuous with the reasons offered for it that [it] seems inexplicable by anything but animus toward the class it affects"). Where the means are completely divorced from the end, as here, the litigation fails the rational relationship test. *See Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 314 (1976) (examining whether mandatory retirement statute "has the effect of excluding from service so few officers who are in fact unqualified as to render age 50 a criterion wholly unrelated to the objective of the statute.").

This conclusion is required if the rational relationship inquiry is to retain any meaning at all, and comports with an analogous Supreme Court case, *Lindsey v. Normet*, 405 U.S. 56 (1972). In *Lindsey*, the Court addressed the constitutionality of an Oregon Forcible Entry and Detainer statute that required tenants appealing an adverse determination to post bond in twice the amount of the rent expected to accrue pending the appellate decision. *Id.* at 64. The governmental interest advanced for that double-bond requirement was to prevent frivolous appeals for dilatory purposes, because absent an added cost the tenant would have no disincentive to forego the appeal. Additionally, the Oregon Supreme Court opined that the additional bond payment would compensate for waste or would be in lieu of damages for unlawful holding over. *Id.* at 76.

The U.S. Supreme Court analyzed the double-bond provision in the context of the pre-existing Oregon appeal provisions for civil cases generally. *Id.* at 74-78. In ordin-

ary civil litigation, the litigant was required to file an undertaking with one or more sureties covering all damages, costs and disbursements which might be awarded against the appellant on appeal. Moreover, for an appellant to obtain a stay of execution in a case involving a monetary judgment, the undertaking had to also provide that the appellant would satisfy the judgment if she lost the appeal. Where the judgment was for real property, that undertaking had to provide that the appellant would commit no waste during the pendency of the appeal, and would pay for the use of property during that time should the appellant lose the appeal. *Id.* at 74-75. The double-bond provision imposed additional obligations for appeals from Forcible Entry and Detainer judgments. In addition to the undertaking required of all civil litigants, an appellant in such an action was compelled to provide an undertaking with two sureties for the payment of twice the rental value of the premises, and if the judgment was affirmed, the landlord was automatically entitled to twice the rents accruing during the appeal. *Id.* at 75.

The Court began its analysis of the double-bond provision by recognizing that even though the state is not required to provide appellate review, when an appeal is afforded, equal protection required that the right not be arbitrarily and capriciously granted to some litigants and not others. 405 U.S. at 77. We are presented with a similar situation here: Congress was not required to provide a mechanism for awarding attorney's fees, but once provided the fees cannot be arbitrarily and capriciously denied to one class of litigants without violating equal protection.

Although the *Lindsey* Court went on to acknowledge that Oregon had a legitimate interest in ensuring that appellants post adequate security for appeal, the Court held that the double-bond requirement did not effectuate that purpose. The Court emphasized that the undertak-

ing already protected the landlord by assuring payment for accrued rent and protection against waste. *Id.* at 77-78. The Court rejected the claim that the double-bond provision would screen out frivolous appeals, because "it not only bars nonfrivolous appeals by those who are unable to post the bond but it also allows meritless appeals by others who can afford the bond." *Id.* at 78. Thus, the Court recognized that the statute was deficient because it was both over- and under-inclusive, and because pre-existing statutes already protected the state's asserted interest.

*Lindsey*'s criticisms parallel the problems presented by the PLRA. The asserted interests in deterring frivolous and trivial litigation are already covered by § 1988, which does not allow any fees at all in such cases. In that context, the limitation on the amount of fees is meaningless for those type of cases. Moreover, the PLRA inevitably impacts the non-trivial, meritorious civil rights cases which Congress claims no interest in deterring. The impact of the 150% limitations are magnified in the prison context, where damage awards are consistently lower than are provided in actions by non-prisoners and where the risk of no recovery is much greater. By linking fees to a percentage of those lower damages, the fee has a greater adverse impact in the prison context than might be experienced in non-prisoner litigation. Finally, the fee restrictions at issue in this case are just two of a number of other restrictions on fees in § 1997e(d). Section 1997e(d)(1) limits the fee amount in two ways: the fee must be directly and reasonably incurred in proving an actual violation, and the amount must be proportionately related to the court ordered relief or directly and reasonably incurred in enforcing the relief ordered for the violation. Therefore, the 150% cap on total fees and on the hourly rate will in all cases operate to reduce the fee award below that baseline amount of fees that were directly, reasonably incurred and proportionate to the

relief ordered. This impact further undermines the arguments made in this case. The fee restrictions have no impact on the frivolous and trivial cases, and operate only to reduce the fee award in meritorious litigation below the amount that was both reasonably incurred and proportionate to the relief. The restrictions therefore lack the fit between classification and governmental interest that is necessary to ensure that the classification is not drawn for the purpose of disadvantaging the group burdened by the law. *Romer*, 517 U.S. at 633. The fit between means and ends is even more attenuated in this case than in *Lindsey*, and therefore the PLRA fee restrictions violate equal protection. *See also Rinaldi v. Yeager*, 384 U.S. 305, 310 (1966) (invalidating requirement that only incarcerated persons repay the costs of transcripts; holding that the statutory interest in deterring frivolous appeals cannot survive equal protection scrutiny because the statute inevitably burdens many whose unsuccessful appeals were nonfrivolous, while leaving untouched many whose appeals were frivolous.)

The remaining interests asserted by the government similarly are insufficient to survive even that minimal level of scrutiny. The government maintains that the PLRA fee restrictions are rationally related to the government interests in reducing federal court intervention into state management of prisons, preventing windfall fee awards, and protecting the public fisc. The first argument is that successful prison litigation may result in consent decrees, involving the federal court in state management of prisons, and that the fee restrictions may reduce the incentive for prisoners to file such claims, thus diminishing federal court involvement in state management of the prisons. The remaining arguments similarly focus on the impact of meritorious litigation on the state, asserting that the fee restrictions would cabin judicial discretion in awarding fees, thus reducing the potential for windfall fee

awards, and would protect the public fisc by decreasing the fees that must be paid out of the state treasuries. All of these justifications focus on the impact occasioned by meritorious prisoner litigation. Certainly, the states would save money if less meritorious litigation were filed against them, and if fees available for such litigation were restricted (although, again, the government's interest must be a legitimate one to survive scrutiny.) Similar savings could be obtained if Congress passed a similar fee restriction applicable to all blue-eyed litigants, all government employee litigants, or all litigation concerning the educational system. Equal protection, however, requires more than just a showing that some goal is furthered by the legislation; rather, equal protection requires "some rationality in the nature of the class singled out." *Rinaldi*, 384 U.S. at 308-09; *Schlib v. Kuebel*, 404 U.S. 357, 368 (1971).

The Court examined the need for that fit between classification and goal in *Rinaldi*. There, a New Jersey statute required indigent persons convicted of a crime, who were confined to prison, to repay the cost of the transcript if they were unsuccessful on appeal. It required no such repayment, however, from those who received a suspended sentence, probation, or only a fine. The state argued that its statute was designed to replenish the county treasury from those who had benefitted from county expenditures, and that it would deter frivolous appeals. 384 U.S. at 309-10. The Court rejected that argument, however, holding that the statute was unconstitutional under the Equal Protection Clause. Certainly, the statute would help replenish the county treasury, but that furtherance of the fiscal goal did not end the Court's inquiry. Instead, the Court held that the Equal Protection Clause requires that, "in defining a class subject to legislation, the distinctions that are drawn have 'some relevance to the purpose for which the classification is made.'" *Id.* at 308-09. In *Rinaldi*,

the classification distinguished institutionalized unsuccessful appellants from those not institutionalized. The Court held, however, that "[t]here is no defensible interest served by focusing on that distinction as a classifying feature in a reimbursement statute, since it bears no relationship whatsoever to the purpose of the repayment provision." *Id.* at 309. Whether a person was institutionalized or not, or the nature of the sentence imposed, was a trait unrelated to the fiscal objective of the statute. *Id.* at 309-310. The Court further rejected the state's claim that the classification was a matter of administrative convenience, because those punished by fines could be reached through ordinary garnishment, and repayment could easily be made a condition of probation. *Id.* at 310. Thus, the Court again recognized that the constitutionality of a statute cannot be analyzed in a vacuum, but must include a recognition of the real context in which it operates. Because incarceration status had no rational connection to a transcript cost, the Court held that the statute lacked rationality in the nature of the class singled out and was unconstitutional under the Equal Protection Clause. *Id.*; *Schlib*, 404 U.S. at 368; *see also James v. Strange*, 407 U.S. 128 (1972) (relying on *Rinaldi* and holding that statute giving state right to recover legal defense costs from indigent defendants and depriving them of protective exemptions violates equal protection).

We are presented with the same situation in addressing the remaining governmental interests asserted here. The government asserts an interest in diminishing the fiscal burden of fees on the states, and also in decreasing the costs associated with defending and monitoring compliance in cases of meritorious litigation. There is no rationality, however, in imposing such a restriction on attorneys representing institutionalized persons, because the locale of the litigant is unrelated to the fiscal objective. Although Congress can approach a problem piece-meal,

there is no attempt in the briefs to explain why inmates should be singled out over non-inmates for the restriction in cases involving meritorious litigation, which is all that is addressed by these last three proffered governmental interests. For instance, the prisoner/non-prisoner classification makes no sense if the interest is in simply protecting the public fisc, because there is no reason to believe that prisoners are filing more non-trivial meritorious cases than non-prisoners, or that they are achieving windfall fee awards in greater numbers in such cases. In fact, the record indicates that at the time the PLRA fee restrictions were enacted, nearly 96% of all prison litigation was *pro se*, and there is no correlation between inmate status and windfall fee awards (at least no correlation that would indicate such awards are more likely to be provided to inmates; the reverse, however, might be true). There is no rational basis to connect inmate status with the goal of reducing the fiscal burden any more than Congress could single out blue-eyed litigants and restrict their fees. The classification itself has to be related to the interest asserted, and it is not. Congress in enacting the PLRA was concerned with the flood of frivolous litigation, not the flood of meritorious litigation. There is simply no basis in the record or in theory upon which we could hold that meritorious litigation by prisoners is creating an economic burden justifying the singling out of inmates for this type of restriction. There is, in short, no connection between the fiscal goals of the statute and the status of the meritorious litigant as either an inmate or a non-institutionalized individual.

As a means of discouraging frivolous or trivial suits by prisoners, the PLRA imposes no restriction on fees that § 1988 does not already impose. As a means of reducing the burden on states, there is no rational reason to single out prisoners. The PLRA fee restrictions will, however, have a significant, predictable impact on the

ability of prisoners with meritorious cases to obtain representation. As the district court recognized, "the only prisoners affected are those who file meritorious complaints for whom the court cannot secure counsel because of the limited fees available to lawyers in such cases." *Johnson*, 117 F. Supp. 2d at 896. Rather than decrease the burden on courts, these restrictions will have the opposite effect, making it more difficult for courts to persuade lawyers to accept appointment. *Id.* at 898. The inevitable result will be that constitutional violations against prisoners will go unremedied, and that is contrary to the purposes of the civil rights acts and § 1988. Congress has no legitimate governmental interest in deterring the filing of meritorious lawsuits. As such, the classification is not rationally related to the goals and fails Equal Protection scrutiny. I respectfully dissent.

FLAUM, *Chief Judge*, dissenting. In my judgment, as Judge Rovner has indicated in her dissent, the plurality's proposed benchmarks for answering the "compared to what?" question miss the mark. The appropriate focus should be between prisoner and nonprisoner litigants seeking fees under § 1988—indeed, I believe that perhaps the most apt comparison would be between former prisoners bringing suit for violations that occurred during their imprisonment and current prisoners bringing suit for identical violations. Cf. *Kerr v. Puckett*, 138 F.3d 321, 323 (7th Cir. 1998) (holding that prisoner as defined in 42 U.S.C. § 1997e(h) does not comprehend a felon who has been released). Concluding that Judge Rovner has identified the correct approach for comparison purposes and agreeing with the well-reasoned analysis contained in Parts II and III of her opinion, I respectfully dissent.

A true Copy:

　　　　Teste:


　　　　　　　　　　_____
　　　　　　　　　　*Clerk of the United States Court of*
　　　　　　　　　　*Appeals for the Seventh Circuit*